**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
_____

|  |  |
|---|---|
| SUSAN MORRIS, | ) |
|  | ) |
| **Plaintiff,** | ) |
|  | ) |
| v. | ) Civil Action No. 11-701 (RMC) |
|  | ) |
| LISA P. JACKSON, Administrator, | ) |
| Environmental Protection Agency, | ) |
|  | ) |
| **Defendant.** | ) |
| _____ | ) |

## OPINION

Susan Morris, a White woman, is a former employee of the Environmental
Protection Agency (EPA). She complains of retaliation and discrimination based on race and
gender relating to a seven-day suspension. The suspension was recommended by Ms. Morris's
immediate supervisor, Karen Higginbotham, Director, Office of Civil Rights, and approved by
Deputy Chief of Staff Ray Spears. EPA moves for summary judgment. Because Ms. Morris
barely presents a *prima facie* case and ultimately fails to prove that EPA's legitimate non-
discriminatory reason for her suspension was a pretext for discrimination, summary judgment
will be entered for EPA.

## I. FACTS

Ms. Morris was employed by the federal government for over thirty years. She
spent the last ten years of her career with EPA in a GS-15 level position. She joined EPA's
Office of Civil Rights in 2001 as a Team Leader for the agency's Workforce Diversity and
Employment Program. Her position was later reestablished as Assistant Director for Affirmative
Employment and Diversity.

During her time at EPA, Ms. Morris received outstanding ratings from her supervisors as well as various awards. She was given a Bronze Award for Commendable Service in 2001 and, in 2004, 2005, and 2006, she was nominated by her staff for the award as Manager of the Year.

As the Assistant Director for Affirmative Employment and Diversity, Ms. Morris was responsible for administering an evaluation program to monitor EPA's compliance with civil rights laws, policies, and procedures. Her immediate supervisor was Karen Higginbotham, Director of the Office of Civil Rights.

On April 29, 2008, Ms. Morris was suspended without pay for seven days. She alleges that the suspension was due to a bogus charge that she engaged in insubordination and that the real reason for her suspension was race and gender discrimination and retaliation for prior protected conduct in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq*.

The charge of insubordination arose from Ms. Morris's management of a diversity program for gay and lesbian employees at EPA. Discrimination based on sexual orientation or parental status is prohibited by Executive Order 11478 and by an EPA Policy Statement that implemented the Executive Order in the agency. *See* Pl. Ex. 10 [Dkt. 36-10], Executive Order; Pl. Ex. 12 [Dkt. 36-12], 2009 EEO Policy Statement.[1] In support of the Executive Order and the EPA Policy Statement, Ms. Morris established a Diversity Program for the specific purpose of addressing gay and lesbian diversity concerns. Ms. Morris hired Jerome King to serve as Diversity Program Manager. EPA field offices founded a Gay and Lesbian Advisory Council to advise Mr. King. Nancy Tommelleo served as the national chair of the Council. At that time,

_____

[1] Ms. Morris filed Exhibits 1 through 19 at Docket 36-1 through 36-19.

Ms. Tommelleo was Acting Chief, Office of Air, Toxics and General Law in EPA Region IV, headquartered in Georgia.

Ms. Tommelleo wanted EPA to implement a recruitment plan for gay, lesbian, bisexual, and transgender employees. *See* Pl. Ex. 1 [Dkt. 36-1], Morris Decl. ¶ 39. In addition, she and other members of the Council proposed that the Council change its name to "Gay, Lesbian, Bisexual, and Transgender Advisory Council." Ms. Morris disagreed. In her view (1) Title VII did not include sexual orientation; (2) Executive Order 11478 and related EPA policy did not require affirmative action; and (3), therefore, the name of the Council should not be changed. Pl. Ex. 13 [Dkt. 36-13], Morris Dep. at 133-42.

Unable to resolve their difference of opinion, Ms. Tommelleo asked to be fully heard on the issue of renaming the Council. A telephone conference was held on August 29, 2007, and Ms. Tommelleo, Mr. King, Ms. Morris, and Ms. Higginbotham participated. During the teleconference, Ms. Morris repeated that she did not believe that "bisexual" should be included in the title of the advisory council, and Ms. Tommelleo disagreed.[2] Ms. Higginbotham decided that the name of the Council would be changed to "Gay and Lesbian and Other Sexual Orientation Advisory Council." Def. Ex. 1,[3] Higginbotham Decl. ¶ 6; *accord* Def. Ex. 8, Issue Sheet, Attachments 5 & 6, Email from Tommelleo 10/12/07.

Subsequently, on September 21, 2007, Karen Higginbotham received via email a memorandum from Mary Wilkes, Regional Counsel, EPA Region IV. Def. Ex. 3, Wilkes

[2] Ms. Higginbotham recalls that Ms. Morris also expressed her view that bisexuality was a lifestyle and not a sexual orientation and that Ms. Tommelleo opposed this view. Higginbotham Decl. ¶ 6.

[3] EPA filed Exhibits 1 through 12 at Docket 32-1 and Exhibits 13 through 20 at Docket 40-2.

Memorandum.  The Wilkes Memorandum complained that Ms. Morris had behaved

unprofessionally during the telephone call:

> I am writing to voice my deep concern and objection to the
> unacceptable behavior shown by your Assistant Director for
> Employment and Diversity, Susan Morris, toward Ms. Nancy
> Tommelleo, of my staff, during a conference call on August 29,
> 2007. . . . I am deeply troubled that a fellow agency senior
> manager treated an employee in the manner Ms. Tommelleo was
> treated, whereby Ms. Morris launched a personal attack upon her
> simply because Ms. Morris disagreed with positions that Ms.
> Tommelleo was advancing on behalf of the National Advisory
> Council.

Wilkes Memorandum at 1-2.  Ms. Wilkes copied the following EPA officials on the email: Ray

Spears, Deputy Chief of Staff; Russell Wright, Acting Deputy Regional Administrator for

Region IV; and Laura Yoshii, Deputy Regional Administrator for Region IX; Catherine McCabe,

an attorney in the Office of General Counsel; and J.I. Palmer, Jr., Regional Administrator for

Region IV.

Attached to the Wilkes Memorandum was a September 10, 2007 memorandum

from Ms. Tommelleo to Ms. Wilkes and Wanda Johnson, Acting Assistant Regional

Administrator for Region IV.  Def. Ex. 4, Tommelleo Memorandum (hereinafter, Wilkes

Memorandum & Tommelleo Memorandum are collectively referred to as the "critical

Memoranda").[4]  Ms. Tommelleo recounted the August 29 telephone call as she remembered it

and complained that Ms. Morris had personally attacked her:

> This verbal assault was so personally and professionally offensive
> that I was stunned and shocked and tried only in response to
> diffuse the situation.  What made it even worse was that Karen
> Higginbotham did nothing to stop this highly inappropriate
> behavior and to date, no one has offered an apology to me.

---

[4] The Tommelleo Memorandum was copied to three Region IV officials: Acting Deputy
Administrator Russell Wright; Manager Bill Anderson; and EEO Officer Randy Dominy.  *See*
Def. Ex. 4, Tommelleo Memorandum.

. . .

> [Ms. Morris] accused me of "badgering her office" on [the issue of renaming the Gay and Lesbian Advisory Council] and other topics and of inappropriately going over her head (since she does not recognize any issue-elevation policy). She went on to pointedly tell me that I was only a "collateral duty" employee, while she was the Associate Director of her office and, further that I had "no business" arguing with her about her programs. Susan also stated that she was "not going to sit and fight with me" on any of these issues and she expressly threatened to do away with our Advisory Counsel [sic] and with the Diversity Program for Sexual Orientation (which she stated that she created). Susan's verbal assault was prolonged, aggressive and very angry and there was no attempt by Karen to interject or put an end to this inappropriate and unprofessional behavior.

Tommelleo Memorandum at 1-2.

Ms. Higginbotham was surprised by the critical Memoranda. She remembered that Ms. Morris had been "sharp" and "forceful" in expressing her views and that the conversation had been "tense," but she did not believe that Ms. Morris had acted disrespectfully. Def. Ex. 1, Higginbotham Decl. ¶¶ 6, 8. Ms. Higginbotham told Ms. Morris that she had received the critical Memoranda, and that she felt they should let some time pass before responding. *Id.* ¶ 9.

Ms. Morris requested a copy of the critical Memoranda, but Ms. Higginbotham answered that she would look for them later because she could not quickly locate them among her many emails or on her desk. *Id.* Over the next three months, Ms. Morris repeatedly asked to see the critical Memoranda. Ms. Higginbotham did not provide copies until December 21, 2007. Ms. Higginbotham attributes the long delay to a number of factors:

> (1) She felt that a "suitable time" should pass before responding to the critical Memoranda;
>
> (2) She had been out of work several weeks due to illness;

(3) She travelled to Houston to assist her brother in recovering from illness;[5]

(4) She had a very heavy workload in October and November 2007 because, in addition to her regular duties, she was required to review performance appraisals for around 300 EPA employees.

*Id.*

When she sent copies of the critical Memoranda to Ms. Morris, Ms. Higginbotham specifically included an order to Ms. Morris:

As we have previously discussed and as you have requested, here is a copy of the memo from Region 4.  <u>Do not respond to this memo</u>.  I will prepare the response and you will be copied on my reply.

Def. Ex. 5, Email to Morris 12/21/07; *see also* Higginbotham Decl. ¶ 10.  Ms. Higginbotham directed Ms. Morris not to respond for a number of reasons.  First, the Wilkes Memorandum was directed to Ms. Higginbotham, not to Ms. Morris, and Ms. Higginbotham believed that she should be the one to respond.  Def. Ex. 1, Higginbotham Decl. ¶ 11.  Second, the sexual orientation advisory council had been a "hot button issue" and Ms. Higginbotham worried that Ms. Morris, "given the opinions that she had expressed on the subject and the sometimes less than diplomatic manner that she had exhibited with other EPA staff in the past, might escalate the situation further."  *Id.*  Third, Ms. Higginbotham thought that "a further passage of time would allow the parties to move beyond any hard feelings that remained from the teleconference."  *Id.*

Ms. Higginbotham did not immediately respond to the critical Memoranda due to other work priorities and health issues.  *Id.* ¶ 12.  Before she could respond, on February 12,

---

[5] Ms. Higginbotham's brother is an astronaut with the National Aeronautics and Space Administration (NASA), who returned on August 21, 2007, from a mission on the Space Shuttle Endeavour.  He became ill while re-acclimating to Earth's gravity.

2008, Ms. Morris sent an email with an attached "Issue Sheet" to (1) Ms. Higginbotham; (2) Stephen Johnson, EPA Administrator; (3) Ray Spears, Deputy Chief of Staff; (4) Laura Yoshii, Deputy Regional Administrator for Region IX; and (5) all members of the Human Resources Council (HRC), including its co-chair, Russell Wright, Acting Deputy Regional Administrator for Region IV.[6]  Def. Ex. 7, Email from Morris 2/12/08.  She attached the critical Memoranda from Mses. Wilkes and Tommelleo, and noted that "[t]o date . . . no response has been received and Ms. Morris has not been allowed to reply to either memo."  Def. Ex. 8, Issue Sheet at 2; *see also id.*, Issue Sheet, Attachments.  Ms. Morris expressed her view that sexual "behavior" should not be part of an affirmative action program, *see* Issue Sheet at 4, and also identified the following "issues":  that Mses. Wilkes and Tommelleo, via the critical Memoranda, attempted (1) to "[u]se[ ] HRC and senior officials to foster personal and/or hidden agendas on EEO policy and programs" and (2) to "[h]arm[] or . . . destroy the reputation, authority, and official standing" of Ms. Morris.  Issue Sheet at 1.  The Issue Sheet aired Ms. Morris's grievances regarding the critical Memoranda from Mses. Wilkes and Tommelleo.  She quoted the critical Memoranda, *see id.* at 1-2, and complained:

> The above memos were sent to various senior level officials in an effort to impact [ ] decisions made by [Ms. Morris] regarding controversial EEO matters under her authority and responsibility. The individuals involved were neither in her Chain of Command nor with authority or responsibility for interfering in the work of her office.  The memos also included false allegations with the intent of harming or attempting to destroy her credibility, authority and official standing within the agency.  Copies of the memos were withheld from her for one month in one case and three months in another in order to prevent her from answering the allegations and so that decisions she made could be circumvented or overturned. In addition, punitive action was recommended against her by senior employees, some of whom she had never met.  Decisions she had made based on her expertise . . . were overturned, her

_____
[6] Messrs. Spears and Wright and Ms. Yoshii had all been copied on the Wilkes Memorandum.

> authority was usurped, and her professional standing and treatment as an exceptional senior female Federal employee since 1975 has been negatively affected.

*Id*. at 7.  Ms. Morris did not obtain approval from anyone in her chain of command before sending out the Issue Sheet.  Def. Ex. 2, Morris Dep. at 175.

Upon receiving the Issue Sheet, Ms. Higginbotham emailed Ms. Morris, indicating that she would consider disciplinary action:

> Susan: I specifically told you not to respond to the memo(s) from Region 4[7] . . . referenced in your 2/12/08 e-mail to the HRD.  I am currently reviewing your actions in this matter and will decide shortly what disciplinary or corrective action I will take . . . .

Def. Ex. 9, Email from Higginbotham 2/14/08.  Ms. Morris answered that she "did not respond to the memos from Region 4 . . . therefore, you have no cause of action, in spite of the fact that you removed my right to defend myself."  *Id*.  Ms. Morris contends that she was not insubordinate because she did not send the Issue Sheet to Mses. Wilkes or Tommelleo.  *See* Opp'n [Dkt. 36] at 2; *see also* Def. Ex. 2, Morris Dep. at 160.

Ms. Higginbotham disagreed and formally proposed that Ms. Morris be suspended.  Higginbotham Decl. ¶ 14.  She believed that Ms. Morris had refused to take responsibility for her actions and that she had been disingenuous in denying her insubordination. *Id*.  Ms. Higginbotham further explained:

> Ms. Morris had expressly referenced [the critical Memoranda] and my instruction in her response [*i.e*., the Issue Sheet].  Also, she was or should have been aware that in sending her response to the entire HRC, including Messrs. Spears and Wright and Ms. Yoshii, it would make its way to Ms. Wilkes and Ms. Tommelleo. Additionally, I felt that by this action, Ms. Morris was challenging my judgment on how best to handle the issues raised by Ms. Wilkes and Ms. Tommelleo.

---

[7] Mses. Wilkes and Tommelleo worked in Region IV.  That is, by referring to the memos from Region IV, Ms. Higginbotham refers to the critical Memoranda.

*Id.* At the time she proposed the suspension, Ms. Higginbotham was not aware of any EEO activity at EPA by Ms. Morris. *Id.* ¶ 16.

Ms. Morris and her attorney met with Mr. Spears to respond to the proposed suspension. After considering the issue, Deputy Chief of Staff Spears approved a seven-day suspension without pay: "I therefore find that you intentionally and wilfully disobeyed Ms. Higginbotham's December 21, 2007 directive to you, by your widespread dissemination of your Issue Paper, significant parts of which constituted a response to the Region 4 memorandum." Def. Ex. 11, Memo from Spears 4/28/08 at 3. Mr. Spears was "troubled" by Ms. Morris's failure to accept responsibility and by her attempt "to rationalize it by stating that it had not been a 'response' to the memoranda but instead a 'separate and distinct' action . . . ." Def. Ex. 1, Spears Decl. ¶ 5.[8] EPA's disciplinary policy provides that the penalty for a first offense of insubordination ranges from a written reprimand to a fourteen-day suspension. Def. Ex. 10, EPA Guidance on Corrective Discipline at 5. The suspension was effective from May 5 to May 11, 2008.

Ms. Morris contends that the seven-day suspension was not due to insubordination, but instead was based on gender and race discrimination and retaliation. By proposing and implementing the seven-day suspension, Ms. Higginbotham and Mr. Spears (both African American), allegedly discriminated and retaliated against Ms. Morris because she is a White woman.[9]

_____

[8] Mr. Spears also noted that Ms. Morris's oral statements to him reinforced his conclusion that she had intentionally disregarded Ms. Higginbotham's directive. "It is apparent to me by the tone of your remarks that you do not believe that you should have to abide by Ms. Higginbotham's decisions and directives." Def. Ex. 11, Memo from Spears 4/28/08 at 3 n.5.

[9] Additional claims in the Amended Complaint have been dismissed. *See* Op. [Dkt. 12] at 14 ("(1) the claim regarding termination of employment is dismissed without prejudice due to failure to exhaust administrative remedies; (2) the claims regarding reassignment of duties, age

EPA moves for summary judgment.  *See* Mot. for Summ. J. [Dkt. 31]; Reply

[Dkt. 40].  Ms. Morris opposes.  *See* Opp'n [Dkt. 36].

## II.  LEGAL STANDARD

### A.  Jurisdiction and Venue

The Court has federal question jurisdiction here because the Title VII claims arise

under federal law.  *See* 28 U.S.C. § 1331.  Venue is proper in this Court pursuant to Title VII's

venue provision.  *See* 42 U.S.C. § 2000e–5(f)(3) (stating that venue is proper "in any judicial

district in the State in which the unlawful employment practice is alleged to have been

committed . . .").

### B.  Federal Rule of Civil Procedure 56

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall

be granted "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  On summary judgment, the burden on a moving

party who does not bear the ultimate burden of proof in the case may be satisfied by making an

initial showing that there is an absence of evidence to support the nonmoving party's case.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  This burden "may be discharged by

'showing'—that is, pointing out to the district court—that there is an absence of evidence to

support the nonmoving party's case."  *Id.*

The burden then shifts to the nonmovant to demonstrate the existence of a

genuine issue of material fact.  The nonmovant may not rest on mere allegations or denials, but

---

discrimination, and retaliation are dismissed; (3) summary judgment is granted in favor of
Defendant on the hostile work environment claim; and (4) the claim regarding the seven-day
suspension remains.").

must instead by affidavit or otherwise, present specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324; *see also Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (nonmovant must present specific facts that would enable a reasonable jury to find in its favor).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. In addition, if the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. at 249-50 (citations omitted). Summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### C. Title VII of the Civil Rights Act of 1964

Title VII prohibits employment discrimination on the basis of race, color, religion, sex, or national origin. 42 U.S.C. §§ 2000e *et seq*. Title VII also prohibits retaliation against an employee for engaging in protected EEO activity.[10] 42 U.S.C. § 2000e–3(a).

In the absence of direct evidence of discrimination, courts generally apply the burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). Under that framework, a plaintiff must first establish a *prima facie* case of

---

[10] Title VII speaks of retaliation as a form of discrimination. 42 U.S.C. § 2000e–3(a). The Court refers to "discrimination" as the "anti-discrimination provision [of Title VII]," (*i.e.*, discrimination based on race, color, religion, sex, or national origin), *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006), and "retaliation" as discrimination based upon an employee engaging in protected activity, 42 U.S.C. § 2000e–3(a).

discrimination by a preponderance of the evidence. *Id.* at 802. If the plaintiff is successful, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its conduct. *Id.* at 802–03. "If the employer meets this burden, the presumption of intentional discrimination disappears, but the plaintiff can still prove disparate treatment by, for instance, offering evidence demonstrating that the employer's explanation is pretextual." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49 n.3 (2003); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–08 (1993).

Once an employer articulates a legitimate, non-discriminatory reason, the *prima facie* case usually becomes "irrelevant." *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008); *see also Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008). At that point, "the district court must conduct one central inquiry in considering an employer's motion for summary judgment . . . [*i.e.*,] whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis." *Adeyemi*, 525 F.3d at 1226. To survive summary judgment, a "plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007). "[B]are allegations of discrimination are insufficient to defeat a properly supported motion for summary judgment." *Burke v. Gould*, 286 F.3d 513, 520 (D.C. Cir. 2002).

The ultimate burden of persuasion rests at all times on the plaintiff. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). "Liability depends on whether the protected trait actually motivated the employer's decision." *Id.* at 141 (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)).

# III.  ANALYSIS

## A.  Gender Discrimination

EPA moves for summary judgment on Ms. Morris's gender discrimination claim. When a plaintiff files an opposition addressing only certain arguments raised by the defendant, "a court may treat those arguments that the plaintiff failed to address as conceded."  *Hopkins v. Women's Div., Bd. of Global Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002); *see also Jones v. Air Line Pilots Ass'n*, 713 F. Supp. 2d  29, 38-39 (D.D.C. 2010) (citing *Hopkins*).  Ms. Morris did not respond in her opposing brief and, thus, she has conceded the claim.  Since Ms. Morris conceded her allegation of gender discrimination, summary judgment shall be entered in favor of EPA on that claim.

## B.  Race Discrimination

EPA asserts a non-discriminatory reason for the imposition of the challenged seven-day suspension—that Ms. Morris was insubordinate when she wrote and distributed the Issue Sheet contrary to Ms. Higginbotham's instruction.  As noted above, ordinarily the articulation of a legitimate, non-discriminatory reason for the adverse employment decision makes the *prima facie* case "irrelevant" and courts conduct one central inquiry into whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer intentionally discriminated against the plaintiff on a prohibited basis.  *See Adeyemi*, 525 F.3d at 1226; *Brady*, 520 F.3d at 495.  This case is atypical, however, because EPA argues that Ms. Morris has not alleged a *prima facie* case, *i.e.*, she has not shown that EPA is the unusual employer that discriminates against Whites.

To establish a *prima facie* case of discrimination, a plaintiff must show that: (1) she is a member of a protected class; (2) she suffered an adverse personnel action; and (3) the

unfavorable action gives rise to an inference of discrimination. *Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 548 F.3d 137, 144 (D.C. Cir. 2008). When a race discrimination claim is made by a White person, not a member of a traditionally disadvantaged group, some adjustment to the "basic allocation of burdens and order of presentation of proof" is needed. *Lanphear v. Prokop*, 703 F.2d 1311, 1314-15 (D.C. Cir. 1983). A White plaintiff must "show additional 'background circumstances [that] support the suspicion that the defendant is that unusual employer who discriminates against the majority.'" *Harding*, 9 F.3d 150, 153 (D.C. Cir. 1993) (quoting *Parker v. Baltimore & Ohio R.R.*, 652 F.2d 1012, 1017 (D.C. Cir. 1981)). A satisfactory showing could include evidence that the "particular employer at issue has some reason or inclination to discriminate invidiously against whites . . . or evidence indicating that there is something 'fishy' about the facts of the case at hand that raises an inference of discrimination." *Id*. at 153.

### 1. *Prima Facie* Case

The question of whether Ms. Morris has presented a *prima facie* case of race discrimination is a close one. EPA argues that Ms. Morris has not demonstrated that EPA had "some reason or inclination to discriminate invidiously against whites" or that there was something "fishy" about her case. *See Harding*, 9 F.3d at 153. Ms. Morris's suspension was handled in accordance with standard procedures. She was notified of the proposed suspension, *see* Def. Ex. 1, Higginbotham Decl. ¶ 15, and she exercised her right to oppose the suspension by responding in writing and orally, with the assistance of counsel, *see* Def. Ex. 1, Spears Decl. ¶¶ 3-4. In addition, the EPA Office of the Administrator, which includes the Office of Civil Rights, was over fifty-eight percent White in 2009. *See* Def. Ex. 12, EPA Workforce Analysis.

Ms. Morris's supporting evidence is weak: she claims that Deputy Chief of Staff Spears asked Ms. Higginbotham why she was hiring "so many white people" when Ms. Higginbotham hired William Haig, a White man, thereby implying that Whites were not wanted. Pl. Ex. 1 [Dkt. 36-1], Morris Decl. ¶ 8. In addition, both Ms. Higginbotham, who recommended the suspension, and Mr. Spears, who approved it, are African American and Ms. Morris is White.

A mere difference in race between supervisors and an employee, without more, cannot support an inference of intentional discrimination. However, Ms. Morris nudges her claim beyond that lonely circumstance with her allegation of intentional race-based preferences in hiring. Because the Court must draw all justifiable inferences in favor of the non-moving party, *see Anderson*, 477 U.S. at 255, the Court will assume that Ms. Morris has presented a *prima facie* case.

### 2. Pretext

In response to Ms. Morris's allegations, EPA has presented a legitimate non-discriminatory reason for her suspension, *i.e.*, insubordination. "Insubordination is firmly established as a legitimate, non-discriminatory reason that satisfies an employer's burden of production under the *McDonnell Douglas* framework." *Edwards v. EPA*, 456 F. Supp. 2d 72, 94 (D.D.C. 2006) (citing cases). In order to overcome EPA's articulated non-discriminatory reason for discipline, Ms. Morris must present evidence that EPA's reason was a mere pretext for intentional discrimination. Pretext can be demonstrated by evidence that suggests, *inter alia*, that the employer lied, failed to follow established procedure, or treated similarly situated employees of another race more leniently. *Gurara v. District of Columbia*, 881 F. Supp. 2d 143, 147 (D.D.C. 2012).

Rather than showing pretext in these ways, Ms. Morris claims that the insubordination charge was false because she did not disobey Ms. Higginbotham's directive, that is, she did not actually respond to Ms. Wilkes or to Ms. Tommelleo. Instead, Ms. Morris sent the Issue Sheet to others with the purpose of expressing her views on whether the Gay and Lesbian Advisory Council should have a broader focus and should include bisexual and transgender employees. Her argument misses the mark as it is grounded on the claim that Ms. Higginbotham and Mr. Spears were "wrong" to conclude that Ms. Morris had been insubordinate. To the contrary, the law is clear that "[a]n employer may make an employment decision for a good reason, a bad reason, or no reason at all so long as racial or other discriminatory distinctions do not influence the decision." *Santa Cruz v. Snow*, 402 F. Supp. 2d 113, 125 (D.D.C. 2005) (citation and quotation marks omitted). In other words, an employer may be completely wrong on the facts when it decides to discipline an employee, but "wrong" is not "discriminatory." A court may not "second-guess an employer's personnel decision absent demonstrably discriminatory motive." *Fischbach v. D.C. Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996). Once an employer articulates a non-discriminatory reason for its action, the issue is not whether it was factually correct but whether the employer "honestly believes in the reasons it offers." *Id*. (citation omitted); *see also Jones v. GlaxoSmithKline, LLC*, 755 F. Supp. 2d 138, 154 (D.D.C. 2010). It has long been recognized that an employee's failure to obey a supervisor's straightforward direction constitutes a legitimate, non-discriminatory reason for discipline; if the employee offers no evidence to show that the suspension was "anything but [a] direct response to obvious insubordination," summary judgment is granted to the employer. *Edwards*, 456 F. Supp. 2d at 94.

Ms. Higginbotham and Mr. Spears believed that Ms. Morris was insubordinate when she sent her Issue Sheet to the entire Human Resources Department and beyond, including her "defense" to the critical Memoranda and veiled complaints about Ms. Higginbotham. There is no question that Ms. Higginbotham had directed Ms. Morris in writing not to respond to the critical Memoranda. While Ms. Morris did not direct her Issue Sheet specifically to Ms. Wilkes or Ms. Tommelleo in Region IV, she disseminated it widely throughout the EPA, including the EPA Administrator (Mr. Johnson) and the Acting Deputy Regional Administrator for Region IV (Mr. Wright). Moreover, the Issue Sheet reveals Ms. Morris's insubordination. While it explicitly recognized Ms. Higginbotham's directive to Ms. Morris, it quoted and discussed the critical Memoranda and attached them. Ms. Higginbotham and Mr. Spears honestly believed that Ms. Morris had responded to the critical Memoranda, contrary to her supervisor's order, when she wrote and emailed the Issue Sheet.[11]

Ms. Morris attempts to show pretext by arguing that Ms. Higginbotham gave preferential treatment to African American employees. She relies on a declaration from Mirza Baig, an EPA employee in the Office of Civil Rights. Ms. Baig opined that "Ms. Higginbotham displayed a strong preference for African[]American employees" and "gave preferential treatment to black employees, [naming certain individuals] . . . ." *See* Pl. Ex. 19 [Dkt. 36-19], Baig Decl. ¶ 4. Ms. Baig's opinions are inadmissible and her statements of fact are vague and conclusory, omitting what treatment was given to whom and when such allegedly disparate treatment occurred. These types of vague and conclusory allegations are insufficient to raise a

---

[11] Ms. Morris attempts to make something of Ms. Higginbotham's failure to respond promptly to the critical Memoranda from Mses. Wilkes and Tommelleo and her arguably inconsistent explanations. This argument is a red herring because it does not bear on the critical issue— whether Mr. Spears honestly believed that Ms. Morris had been insubordinate when he made the final decision to suspend her.

genuine issue of material fact. *See Celotex*, 477 U.S. at 324 (in opposing summary judgment, a plaintiff may not rest on mere allegations but must present specific facts showing that there is a genuine issue for trial).

Ms. Morris also references Ms. Baig's statement that Ms. Higginbotham hired Bassie McCain and Natalie Twyman, both African American, and quickly promoted them from administrative assistant to EEO counselor. Pl. Ex. 19 [Dkt. 36-19], Baig Decl. ¶ 5. Uncontested record facts undermine this argument. Ms. Higginbotham avers that she selected Mr. McCain from a list of applicants without knowing his race. Def. Ex. 13, Higginbotham Supp. Decl. ¶ 4. Further, she promoted Mr. McCain and Ms. Twyman only after they were recommended for promotion by their supervisor, Ronald Ballard, who is White. *Id*. ¶¶ 4-5. In addition, Ms. Higginbotham hired Ronald Ballard as an Assistant Director and William Haig as coordinator of reasonable accommodations, and she approved the reassignment of Gordon Schisler to the position of Deputy Director. *Id*. ¶ 6. Messrs. Ballard, Haig, and Schisler are all White.

Ms. Morris points to the allegation by former EPA employee, Alease Wright, that "Ms. Higginbotham told me that Jonathon Newton, an African American, could not get a promotion from a white woman, so she told Ray Spears to send him down to her office and she would give him a GS-15" and that Ms. Higginbotham "did promote Mr. Newton to a GS-15." Pl. Ex. 18 [Dkt. 36-18], Wright Decl. ¶ 6; *see also* Pl. Ex. 18 [Dkt. 36-1], Morris Decl. ¶ 13 (alleging that Ms. Higginbotham stated publicly that "if the white woman up there won't promote [Mr. Newton], I will"). Again, this allegation is belied by the record. Mr. Newton was already working at a grade GS-15 when he was laterally reassigned to the Office of Civil Rights. Def. Ex. 14, Newton SF-50s (showing that Newton was promoted to GS-15 in December 2003

and reassigned in August 2004). In addition, Mr. Newton's prior supervisor was not a White woman but an African American man. Def. Ex. 13, Higginbotham Supp. Decl. ¶ 3.

Ms. Morris adds that Ms. Higginbotham's bias against Whites was revealed by her comments: Ms. Higginbotham allegedly referred to men working outside the EPA Administrator's Office as "little nasty white boys," Pl. Ex. 13 [Dkt. 36-13], Morris Dep. at 82-83; at a staff meeting discussing a finding of discrimination, Ms. Higginbotham allegedly said that "those white boys . . . will learn a lesson now," *id.* at 86; former EPA employee Alease Wright said that Ms. Higginbotham referred to Ms. Morris in 2005 or 2006 with the comment that "the little White woman better learn to stand in line" and "this is EPA we can whip her into shape," Pl. Ex. 18 [Dkt. 36-18], Wright Decl. ¶ 7; and, in 2006, EPA employee Chris Emmanuel told Ms. Morris that Ms. Higginbotham was "going after" Ms. Morris,[12] Def. Ex. 2, Morris Dep. at 93-96.

"'Stray remarks,' even those made by a supervisor, are insufficient to create a triable issue of discrimination where . . . they are unrelated to an employment decision involving the plaintiff." *Simms v. General Printing Office*, 87 F. Supp. 2d 7, 9 (D.D.C. 2000). Similarly, stray remarks that were not directed at a plaintiff and were not made by persons involved in the contested adverse action are immaterial. *See Goss v. George Washington Univ.*, 942 F. Supp. 659, 664-65 (D.D.C. 1996). Ms. Higginbotham's alleged comments regarding "white boys" were not related to the decision to suspend Ms. Morris, they were not directed at or about Ms. Morris, and they were not made by the deciding official, Mr. Spears.

Further, the alleged remarks that Ms. Morris was a "little White woman" who should be "whip[ped] into shape," and that Ms. Higginbotham was "going after" her were made

---

[12] Mr. Emmanuel's alleged statement is hearsay, which "counts for nothing" on summary judgment. *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007).

in 2005 or 2006, years before Ms. Higginbotham recommended, and Mr. Spears made, the decision to suspend Ms. Morris in 2008. A comment made years before an adverse employment decision, by a person who did not make the challenged decision, can only show pretext if there is evidence that the comment influenced or infected the decision. For example, in *Hampton v. Vilsack*, 685 F.3d 1096 (D.C. Cir. 2012), an employee claimed that he suffered from race discrimination when he was terminated by his second-line supervisor. In support of his claim, he pointed to his first-line supervisor's use of a racial epithet years before his discharge. 685 F.3d at 1097. The D.C. Circuit affirmed summary judgment in favor of the employer, finding that there was no evidence that race was a motivating factor in the second-line supervisor's independent decision to terminate the employee for misconduct. 685 F.3d at 1101. The plaintiff introduced no evidence that the direct supervisor's animus, revealed by a racial epithet uttered in 2002, infected the second-line supervisor's decision to terminate, made four or five years later. *Id*. Proper procedure was followed, the second-line supervisor conducted an independent review of the alleged misconduct, and the second-line supervisor was the deciding official. The D.C. Circuit noted that "[w]hen the causal relationship between a subordinate's illicit motive and the employer's ultimate decision is broken, and the ultimate decision is clearly made on an independent and a legally permissive basis, the bias of the subordinate is not relevant." *Id*. at 1102 (quoting *Willis v. Marion Cnty. Auditor's Office*, 118 F.3d 542, 547 (7th Cir. 1997)).

The analysis from *Hampton v. Vilsack* applies here. The Court finds that allegations of biased comments by Ms. Higginbotham were too stale to support an inference of discrimination in the 2008 decision to suspend Ms. Morris for seven days, which was made independently by Mr. Spears. Even if Ms. Morris demonstrated that Ms. Higginbotham was biased against Whites, Mr. Spears made the final decision to suspend Ms. Morris, not Ms.

Higginbotham.  Mr. Spears conducted an independent review, without speaking to Ms. Higginbotham about the proposed suspension or the conduct that led to it.  *See* Def. Ex. 1, Spears Decl. ¶¶ 3-5.  Mr. Spears separately concluded that Ms. Morris had "intentionally and wilfully disobeyed Ms. Higginbotham's December 21, 2007 directive" via the "widespread dissemination of [the] Issue Paper, significant parts of which constituted a response to the Region 4 memorand[a]."  Def. Ex. 11, Memo from Spears 4/28/08 at 3.   Ms. Morris presents no evidence that Ms. Higginbotham's alleged racial animus infected or influenced Mr. Spears's disciplinary decision.[13]

### C.  Retaliation

To establish a *prima facie* case of retaliation, a plaintiff must show that: (1) she engaged in protected activity; (2) she suffered from a materially adverse act; and (3) a causal connection exists between the protected activity and the employer's act.  *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002).  A plaintiff must present sufficient evidence to support a finding that retaliation was the true reason for the challenged action.  *McGrath v. Clinton*, 666 F.3d 1377, 1383-84 (D.C. Cir. 2012).  A materially adverse act is not necessarily confined to the workplace, as long as "a reasonable employee would have found the challenged action materially adverse."  *Burlington*, 548 U.S. at 68.  To be materially adverse, an employer's action must be more than "those petty slights or minor annoyances that often take place at work and that all

---

[13] While Ms. Morris has been proceeding on a single-motive claim, alleging that EPA "discriminated against [Ms. Morris] on the basis of her race," *see* Am. Compl. ¶ 19, in opposing summary judgment she asserts a mixed-motive claim, alleging that "one of" the reasons for her suspension was discrimination.  *See* Opp'n at 28-29.  Generally, a plaintiff cannot raise a claim on summary judgment that she did not raise in the complaint.  *See Franks v. Salazar*, 816 F. Supp. 2d 49, 58 n.5 (D.D.C. 2011); *but see Turner v. Shinseki*, 824 F. Supp. 2d 99, 122 n.23 (D.D.C. 2011) (plaintiff constructively amended complaint via summary judgment briefing).  Even if Ms. Morris alleged a mixed-motive claim, it would fail because there is no evidence that Mr. Spears had any discriminatory motive, *i.e.*, that he suspended Ms. Morris, even in part, because she is White.

employees experience," *id.*; a materially adverse action is one that would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Id.*; *see also Baloch v. Kempthorne*, 550 F.3d 1191, 1198–99 (D.C. Cir. 2008).

The Amended Complaint asserts that EPA retaliated against Ms. Morris because: (1) she had certified a Management Directive (MD) 715 report that was critical of Ms. Higginbotham, Am. Compl. ¶ 9; (2) she had reported Ms. Higginbotham "for refusing to submit MD-715 reports to the EEOC," *id.* ¶ 15; and (3) she had taken "opposing civil rights views from management," *id.* ¶ 21. Protected activity under Title VII is limited to participating in EEO activity or opposing unlawful employment practices as defined in 42 U.S.C. § 2000e-2 & e-3, which deal exclusively with employment discrimination on the basis of race, color, religion, sex, or national origin. *King v. Jackson*, 468 F. Supp. 2d 33, 37-38 (D.D.C. 2006). Ms. Morris's certification of an MD-715 report critical of Ms. Higginbotham, her complaint that Ms. Higginbotham was not submitting MD-715 reports as required, and her opposition to her manager's decision to expand beyond what EPA policy required are not protected activities under Title VII.

Ms. Morris also alleges that EPA retaliated against her based on an EEO complaint that she filed when she was employed by the Army. Def. Ex. 17, Morris Dep. at 196-99. EPA employee Jessleyn Pendarvis allegedly informed Ms. Higginbotham about Ms. Morris's EEO complaint against the Army in 2005 or 2006. *Id.* at 197.

Even if Ms. Morris's hearsay testimony concerning Ms. Pendarvis's alleged report to Ms. Higginbotham were admissible, Ms. Morris does not assert that Mr. Spears, the deciding official, knew about her prior EEO complaint against the Army. Where "the officials responsible for an allegedly adverse employment action are unaware of the employee's prior

EEO activity, that employee cannot establish a prima facie case of retaliation." *Bolden v. Clinton*, 847 F. Supp. 2d 28, 39 (D.D.C. 2012) (citing cases); *see also Taylor v. Mills*, 892 F. Supp. 2d 124, 146 (D.D.C. 2012) (finding no genuine issue of material fact concerning supervisor's alleged retaliatory motive where supervisor was not implicated in prior EEO complaints). Further, even if Mr. Spears did know about Ms. Morris's prior EEO activity at the Army, Ms. Morris fails to establish any connection between her 2005-2006 EEO complaint and Mr. Spears's suspension decision in 2008, years later and at an entirely different workplace. Protected activity that predates a challenged employment action by more than a year will rarely support an inference of causation. *Na'im v. Clinton*, 626 F. Supp. 2d 63, 78 (D.D.C. 2009); *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'") (citing cases that found three and four month time gaps to be insufficient to show a *prima facie* case of retaliation). In addition, the fact that Ms. Morris's prior EEO complaint was directed against *Army* decision-makers substantially undermines her claim that *EPA* supervisors were motivated to retaliate. *See Taylor*, 892 F. Supp. 2d at 146.

Ms. Morris also ties her retaliation allegations to her "protected activity by complaining to Ms. Higginbotham" in January and February 2008. *See* Opp'n at 23. Ms. Morris references her February 14, 2008, response to Ms. Higginbotham's statement that Ms. Higginbotham was deciding what to do about Ms. Morris's insubordinate conduct.[14] On that occasion, Ms. Morris responded, "I have already taken actions to protect myself from you and

---

[14] Ms. Morris had distributed the Issue Sheet two days earlier, on February 12, 2008. *See* Def. Ex. 7, Email from Ms. Morris 2/12/08.

will take whatever other actions are necessary if you proceed." Def. Ex. 9, Email from Morris 2/14/08. Ms. Higginbotham did not understand this statement to mean that Ms. Morris planned to file an EEO complaint. Def. Ex. 1, Higginbotham Decl. ¶ 16. Regardless of Ms. Higginbotham's understanding, Ms. Morris does not present evidence (or even allege) that Mr. Spears *knew* that Ms. Morris planned to file an EEO complaint when he issued the suspension notice. Without evidence of Mr. Spears's knowledge of prior protected EEO activity, Ms. Morris cannot establish a *prima facie* case of retaliation. *See Bolden*, 847 F. Supp. 2d at 39.

Without regard to whether she established a *prima facie* case of retaliation, Ms. Morris has not raised a genuine issue of material fact with regard to her claim of pretext. *See* Opp'n at 25-27 (advancing identical arguments for pretext with respect to claims of intentional discrimination and retaliation). The Court has analyzed and rejected these arguments above. Accordingly, summary judgment will be granted in favor of EPA on Ms. Morris's retaliation claim.

## IV. CONCLUSION

For the reasons set forth above, EPA's motion for summary judgment [Dkt. 31] will be granted, and judgment will be entered in favor of EPA. A memorializing Order accompanies this Opinion.

Date: February 12, 2014

_____/s/_____
ROSEMARY M. COLLYER
United States District Judge