# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**SUSAN M. MORRIS,**

  **Plaintiff,**

   v.

**SCOTT PRUITT, in his official capacity as Administrator, U.S. Environmental Protection Agency,**

  **Defendant.**

Civil Action No. 11-701 (JEB)

## MEMORANDUM OPINION

  Although this case has spanned nearly seven years, its genesis lasted only seven days. That was the length of the insubordination suspension that Plaintiff Susan Morris claimed was discriminatorily imposed on her. Morris, who is white, worked as a manager in the Environmental Protection Agency's Office of Civil Rights for almost a decade. Her supervisor was Director Karen Higginbotham, who in turn reported to Ray Spears, the agency's Deputy Chief of Staff, both of whom are black. While Morris received several awards for leadership and service during her time at EPA, her career was sidetracked in 2008, when Higginbotham proposed (and Spears approved) her week-long suspension. Morris attributes that discipline to her race.

  Judge Rosemary Collyer, to whom the case was previously assigned, granted summary judgment in the Government's favor on this question, but the Court of Appeals reversed, holding that "a reasonable jury could find that Morris's suspension was motivated by racial discrimination." Morris v. McCarthy, 825 F.3d 658, 663 (D.C. Cir. 2016). When the case finally went to trial, a jury did so find and awarded Morris $25,000 in damages. The

1

Government now seeks to upset that verdict, moving both for judgment as a matter of law and a new trial. It does not succeed.

I.      **Background**

The Court begins with the facts that emerged at trial, resolving, as it must given the verdict, all reasonable inferences in Plaintiff's favor. It then briefly recounts the case's procedural history.

A.      Factual Background

Morris spent 32 years in government service and was a ten-year veteran of the EPA. See Trial Tr. (10/30/17 AM) at 91:15-21. In 2004, she became a supervisory program manager at the agency's Office of Civil Rights (OCR), where she oversaw the Affirmative Employment and Diversity staff. Id. at 96-101. During her tenure, she received several leadership awards, including the prestigious Distinguished Public Service Award from National Image, Inc., a nonprofit Hispanic organization. See Trial Tr. (10/30/17 PM) at 44-45. Additionally, her staff nominated her for the EPA Administrator's Manager-of-the Year award for three consecutive cycles. Id. at 43:18-21. At trial, her employees testified that she was a "very fair" and "very supportive manager," Trial Tr. (10/31/17 AM) at 97:21-22, with one going so far as to deem her "the best supervisor [he] ever had within the government for the last 40 years." Id. at 80:17-81:19.

This upward trajectory was arrested, however, after a fateful conference call with fellow EPA employee Nancy Tommelleo in August 2007. See Trial Tr. (10/30/17 PM) at 52-54. During that conversation, the two discussed the agency's new advisory group for gay and lesbian employees, disagreeing about the proper name for it. Id. at 61-62. Morris thought the call had gone innocently enough, id. at 67, and Higginbotham, who was also on the line, similarly found Morris "forceful" but not "disrespectful" during the conversation. See Trial Tr. (10/31/17 PM) at

96:14-17 (quoting Higginbotham's deposition).  Tommelleo, however, immediately penned a memo to her supervisor, Mary J. Wilkes, complaining that Morris had launched a "highly inappropriate" "verbal assault" against her.  See Trial Tr. (10/30/2017 PM) at 78:1-2; 79:4-7.  On September 21, 2007, Wilkes forwarded this memo to Higginbotham, Spears, and other senior EPA officials, along with her own memo objecting to Morris's conduct.  Id. at 74-75.

Higginbotham told Morris about the memo shortly after receiving it, and Morris was understandably shaken by the allegations against her.  Despite Plaintiff's repeated requests, however, Higginbotham refused to provide her with a copy until three months later.  Id. at 67-70.  At that point, she advised: "Do not respond to this memo. I will prepare the response and you will be copied on my reply."  Id. at 74:6-8 (emphasis in original).  But when Higginbotham had failed to respond by February 2008, id. at 83:21-84:8, Morris took matters into her own hands, emailing a document that she called an "Issue Paper" to Higginbotham, Spears, and the members of the agency's Human Resources Council.  Id. at 86-89.  That Issue Paper principally complained about broader office policies and dynamics.  Id. at 91:10-19, 93:18-20.  It also cited various personal attacks on Morris's own reputation — including Tommelleo's memo, Wilkes's accompanying memo, and Higginbotham's failure to respond as promised, as well as her refusal to allow Morris to reply.  Id. at 94-96.  In her "Background" section, Morris also directly quoted passages from the Tommelleo and Wilkes memos.  Id.

Higginbotham immediately emailed Morris to say that she believed the Issue Paper directly violated her order not to respond to Tommelleo's memo, and that she would consider disciplinary action as a result.  See Trial Tr. (10/31/PM) at 54:7-23.  In reply, Morris maintained that she had not, in fact, responded, and Higginbotham thus had no basis for discipline.  Id. at 54:24-25, 55:1-4.  A month later, Higginbotham proposed to Spears that Morris be suspended

without pay for seven days.  Id. at 86:23-25, 87:1.  Spears approved the suspension in April

2008.  See Trial Tr. (11/1/17 AM) at 22:19-21.

B.    Procedural Background

Morris brought suit in district court on April 8, 2011, alleging principally that both this

2008 suspension — as well as her subsequent 2010 termination (which was not at issue at trial)

— violated Title VII of the Civil Rights Act of 1964.  Judge Collyer, who originally presided

over the case until it was transferred to this Court on September 27, 2017, see ECF No. 59,

dismissed the termination claim for failure to exhaust.  See Morris v. Jackson, 842 F. Supp. 2d

171, 178 (D.D.C. 2012), aff'd, 825 F.3d at 667.  The suspension claim has taken a more

circuitous route.  While Judge Collyer initially granted summary judgment on it, see ECF No.

42, the D.C. Circuit reversed, holding that a reasonable jury could find that Morris's suspension

was motivated by racial discrimination.  See Morris, 825 F.3d at 669.

Once this Court inherited the case, it shortly thereafter proceeded to trial.  Four days of

testimony later, the jury returned a verdict in favor of Plaintiff, awarding her $25,000 in damages

for both lost pay and non-economic damages.  See ECF No. 73.  Unhappy with this result, the

Government now moves for judgment as a matter of law or, alternatively, for a new trial.

**II.    Legal Standard**

The Government first moves under Federal Rule of Civil Procedure 50(a), which

provides that "[i]f a party has been fully heard on an issue during a jury trial and the court finds

that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party

on that issue," the trial court may enter judgment as a matter of law on that issue.  In evaluating

such a motion, the court cannot "lightly disturb a jury verdict. Judgment as a matter of law is

appropriate only if the evidence and all reasonable inferences that can be drawn therefrom are so

one-sided that reasonable men and women could not have reached a verdict in plaintiff's favor."

Muldrow v. Re–Direct, Inc., 493 F.3d 160, 165 (D.C. Cir. 2007) (internal quotation marks and citation omitted). This Court "cannot substitute its view for that of the jury, and can assess neither the credibility nor weight of the evidence." Scott v. District of Columbia, 101 F.3d 748, 753 (D.C. Cir. 1996).

Federal Rule of Civil Procedure 59(a)(1)(A), meanwhile, states that after a jury trial, "[t]he court may, on motion, grant a new trial on all or some of the issues . . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." Although this articulation may be less than helpful, courts outside our Circuit have expanded on its meaning. See, e.g., EEOC v. New Breed Logistics, 783 F.3d 1057, 1066 (6th Cir. 2015) ("The language of Rule 59(a) has been interpreted to mean that a new trial is warranted when a jury has reached a seriously erroneous result as evidenced by . . . the verdict being against the weight of the evidence . . . or the trial being unfair to the moving party in some fashion.") (internal quotation marks and citation omitted); Venson v. Altamirano, 749 F.3d 641, 656 (7th Cir. 2014) ("A new trial is appropriate if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party.").

That demanding standard reflects the principle that "Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, [or] securing a rehearing on the merits." Sequa Corp. v. GBJ Corp., 156 F.3d 136, 144 (2d Cir. 1998). "Although parties may certainly request a new trial or amended findings where clear errors or manifest injustice threaten, in the absence of such corruption of the judicial processes, where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." Int'l Ore. & Fertilizer Corp. v. SGS Control Servs., Inc., 38 F.3d 1279, 1287 (2d Cir. 1994) (internal quotation marks and citation omitted).

**III. Analysis**

After four days of trial and two of deliberations, a jury attributed Morris's suspension to racial discrimination. The Government now wants another bite at the apple, asking this Court to either reverse that verdict outright or at least permit a replay. But in law, as in life, there are rarely do-overs. Not prone to "lightly disturb a jury's verdict," McGill v. Munoz, 203 F.3d 843, 845 (D.C. Cir. 2000), the Court will deny the Motion in both respects after separately examining each defense position.

    A.    Judgment as Matter of Law

The Government first seeks judgment as a matter of law, arguing that "the evidence firmly established that Plaintiff had been insubordinate and no reasonable jury could find otherwise." JMOL Mot. at 2. This stance, however, is little more than *déjà vu* all over again. Defendant adopted the same position at summary judgment and indeed convinced the trial judge to concur. But on appeal, the Court of Appeals held flatly: "[A] reasonable jury could find that Morris's suspension was motivated by racial discrimination," rather than insubordination. See Morris, 825 F.3d at 663 (emphasis added). The Government thus faces an uphill battle, needing to show that evidence at trial deviated in some significant respect from that promised to the D.C. Circuit.

To refresh, Morris's essential claim was that her direct supervisor, Karen Higginbotham, harbored racial animus against her. Although it was Ray Spears who ultimately issued the suspension, the Court of Appeals allowed the case to proceed to trial "[u]nder a cat's paw theory of discrimination," which allows liability for "discriminatory acts by a direct supervisor — even where that supervisor is not the final decisionmaker." Id. at 668. To prevail, a plaintiff must show that "[1] [the] supervisor performs an act motivated by [discriminatory] animus [2] that is intended by the supervisor to cause an adverse employment action, and . . . [3] that act is a

proximate cause of the ultimate employment action." Id. (alterations in original) (emphasis omitted) (quoting Staub v. Proctor Hosp., 562 U.S. 411, 422 (2011)).

The D.C. Circuit concluded that a reasonable jury could find all three prongs satisfied. Specifically, it held that "Staub's second prong is easily met: Higginbotham's recommendation that Morris be suspended for insubordination was clearly intended to cause such a suspension." Id. The first and third prongs, by contrast, at least "warrant[ed] discussion" by the panel. Id. Following its lead, the Court picks up there.

### 1. Suspension Motivated by Racial Animus

Under the first prong, the Circuit held that "a reasonable jury could find that the insubordination charge was pretextual and that Higginbotham was motivated by discriminatory animus when she recommended suspending Morris." Id. at 669. It based that conclusion on two grounds: (a) "evidence that Higginbotham harbored bias toward white employees," and (b) "weaknesses Morris identifies in EPA's explanation for the suspension." Id. The evidence at trial unfolded along those lines as well.

### a. Evidence of racial bias

A jury may infer discrimination from, among other things, "evidence of discriminatory statements or attitudes on the part of the employer." Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc). In that vein, the Court of Appeals deemed Plaintiff's "strongest evidence" of racial animus statements that Higginbotham had made in the workplace:

> An EPA employee supervised by Morris, Alease Wright, recalled that around 2005 or 2006, Higginbotham said of Morris, "[T]he little white woman better stand in line . . . . [T]his is EPA[;] we can whip her into shape." Wright also testified that "Higginbotham told me that John Newton, an African-American, could not get a promotion from a white woman, so she told Ray Spears to send him down to [Higginbotham's] office and she would give him a [promotion to pay-scale level] GS-15." Similarly, Morris attested that

> Higginbotham once said, "[I]f the white woman up there won't promote [Newton], I will." Morris further testified that on one occasion Higginbotham referred to a group of young men working at EPA as "nasty little white boys." Another time, at a staff meeting discussing an unrelated incident in which EPA was found to have discriminated against an employee, Higginbotham told the staff that "those white boys . . . will learn a lesson now."

Morris, 825 F.3d at 669 (internal quotation marks and citations omitted).

Morris provided evidence of essentially the same statements at trial. See Trial Tr. (10/30/17 PM) at 25:9-13 (Higginbotham referred to interns as "those little nasty white boys"); id. at 27:19-20 (Higginbotham said, "[T]hat will teach those white men a lesson."); Trial Tr. (10/31/17 AM) at 58:10-11, 60:3-4 (Higginbotham said that "that little white woman better stand in line" or she would "whip her into shape"); id. at 61:21-25, 62:20-23, 63:1 (Higgonbtham "told management to send [Newton] to our office so that she could promote him . . . [b]ecause he was working for a Caucasian lady . . . [who] would not promote him." ). The Government's only answer was that Higginbotham would "look [the jury] in the eye," "tell [them] that never happened," and that "[a]nybody else who says differently is not telling the truth." Trial Tr. (10/30/17 AM) at 89:24-25, 91:1-2. Higginbotham did in fact flat out deny each statement. See Trial Tr. (10/31/17 PM) at 20:2-11; 21:4-9; 26:3-22. The dispute thus came down to a classic credibility contest and one properly within the province of the jury.

The Government does not dispute as much, instead taking potshots at Plaintiff's "supposed comparator evidence." JMOL Mot. at 21. In Title VII cases, "comparator evidence" suggests "that the employer treated other employees of a different race . . . more favorably in the same factual circumstances." Burley v. Nat'l Passenger Rail Corp., 801 F.3d 290, 296-97 (D.C. Cir. 2015) (internal quotation marks omitted) (alteration in original). At trial, Morris identified two such instances in which African-American EPA employees were not disciplined, despite

purportedly similar acts of insubordination.  See Trial Tr. (10/30/17 PM) at 16:2-25; id. at 17:13-23; 18-19.

While this evidence did not prove particularly powerful, the Court disagrees that it was "completely irrelevant."  JMOL Mot. at 22.  According to Morris, Higginbotham was aware of each employee's noncompliance with direct orders, had authority to reprimand them, and yet declined to do so (and indeed later rewarded the two employees with letters of recommendation or EPA awards).  The jury could have found her treatment of Plaintiff more extreme by comparison.  More important, even if the value of such comparator evidence was limited, Plaintiff did not need to introduce it at all.  As the Court of Appeals noted, she had already produced sufficient evidence for a jury to infer discriminatory intent through the racially charged statements just described.  Those alone "could lead a reasonable juror to find that [Higginbotham] harbored a discriminatory attitude toward white employees."  Morris, 825 F.3d at 670.

b.  Pretextual explanation for suspension

A plaintiff, of course, "must show more than a general bias against white employees; she must also introduce enough evidence for a reasonable jury to find that her suspension was motivated by that bias."  Id.  The Court of Appeals held that  Plaintiff could satisfy that burden by poking holes in Higginbotham's explanation for the suspension.  Id. at 671.  To wit, "a reasonable jury could find that [Plaintiff's] issue sheet was not a 'response' to Tommelleo's memo and could therefore infer that Higginbotham did not honestly believe Morris had violated the instruction not to respond."  Id.

On this point, Morris highlighted at trial (as on appeal) that she wrote an "Issue Paper" (or Issue Sheet) to the agency's Human Resources Council, primarily protesting (1) broader

office policies, including involvement of EPA staff outside of OCR in the agency's equal-employment policies and (2) Higginbotham's refusal to respond to the allegations in the memo. See Trial Tr. (10/30/17 PM) at 93:11-24. She testified that she did not send the Issue Paper to Tommelleo or Wilkes, nor did she contact either woman directly. Id. at 94-97. Rather, she "summarized" the issues in a "background" section, at times quoting the text of the memo. Id. at 94:2-6. Although her Issue Paper mentioned, in one paragraph, that the "memos included false allegations," Morris otherwise refrained from characterizing the charges against her. Id. at 103:5-7.

The D.C. Circuit also found it significant that Higginbotham had failed to pass along, and then respond to, the Tommelleo memo. As noted above, Higginbotham first received a copy of the memo on September 21, 2007. Although she informed Plaintiff of its contents, she repeatedly refused to turn it over, claiming that she could not find the memo and it "might be in the pile of papers." Id. at 75:19-25. The email, of course, was easily available electronically. Id. at 76:1-4. During her deposition, Higginbotham gave a different rationale: other work priorities overwhelmed her during the fall of 2007, and she was dealing with her own medical issues and those of her ailing brother. See Trial Tr. (10/31/17 PM) at 96-98 (quoting deposition testimony). But Morris presented evidence that those medical issues were largely resolved by mid-September 2007, id. at 98:15-19, and that the additional work priorities wrapped up in November, id. at 98:20-99:3 — well before Higginbotham finally released the memos in December 2007.

At trial, Higginbotham tried out yet another explanation: she "purposely waited" to provide Morris with the documents because she "wanted the situation to kind of cool off." Trial Tr. (10/31/17 AM) at 133:9-19. When confronted with her deposition, however, Higginbotham

claimed only that she "was mistaken" at the time.  <u>See</u> Trial Tr. (10/31/17 PM) at 95:14.

Plaintiff's counsel then showed her a signed affidavit, in which she had repeated the same claims

about "personal illness" and work priorities delaying her response.  <u>Id.</u> at 96-97.  Faced with her

sworn statement, Higginbotham did an about-face, insisting that those explanations were true

after all.  <u>Id.</u> at 97:20-22.  A reasonable jury might well have viewed these shifting rationales

with suspicion and questioned Higginbotham's credibility about the Tommelleo incident.

> All told, the jury could discern the following sequence:

> > Higginbotham knew that Morris, a senior manager in her group, had been wrongly accused of unprofessional conduct. She forbade Morris from responding to those accusations, promising that she would do so herself. But she failed to reply for some two months after sending Tommelleo's memo to Morris (five months after receiving it in the first place) and offered unpersuasive explanations for that failure. Morris, forbidden from responding to the allegations herself and finding her supervisor unwilling to step in, ultimately submitted a human resources complaint protesting her supervisor's handling of the incident and broader office policies, taking care not to reply directly to the employees who had made the accusations. She was then charged with insubordination for violating the order not to "respond."

<u>Morris</u>, 825 F.3d at 671.  Viewed from this perspective, the Court of Appeals reasoned, "a

reasonable jury could be 'quite suspicious' of the sincerity of Higginbotham's insubordination

charge."  <u>Id.</u>  This, "combined with evidence that Higginbotham had made repeated, disparaging

comments about white employees," could lead the jury to conclude that "the insubordination

charge was pretext for racial discrimination."  <u>Id.</u> at 672.

The Government challenges that conclusion on three grounds.  First, it says that before

the D.C. Circuit, Plaintiff argued that she had only "<u>recounted</u>" some allegations in her Issue

Paper.  <u>See</u> JMOL Mot. at 19.  The evidence at trial, it maintains, "showed that the Issue Sheet in

fact <u>refuted</u> those allegations by describing them as 'false.'"  <u>Id.</u> (emphasis added).  The Court of

Appeals, however, had the same Issue Sheet before it and nevertheless believed that because Morris "did not answer[] the accusations at any length," the jury could construe it as a "human resources complaint," rather than a response. See Morris, 825 F.3d at 671. In other words, a single line in a nine-page, single-spaced memo did not necessarily transform the Issue Sheet into a "response" to the Tommelleo memo.

Second, Defendant contends that even if Higginbotham were mistaken, the evidence "[o]verwhelmingly" showed that she subjectively believed plaintiff had been insubordinate. See Mot. at 19-21. It argues that on the stand, Higginbotham "testified unequivocally that she considered the Issue Sheet to be a response to the Wilkes and Tommelleo memoranda and therefore, a violation of her instruction not to respond." But as the D.C. Circuit previously held, a judge "cannot say as a matter of law that Higginbotham honestly believed the nondiscriminatory reason she provided. While a reasonable jury might infer . . . that Higginbotham's justification was sincere, it might instead infer that in charging Morris with insubordination, Higginbotham was dissembling to cover up a discriminatory motive." Morris, 825 F.3d at 672. And, once again, "[r]esolving such conflicting inferences is precisely the type of function we leave to the jury, not to a judge." Id.

Third, the Government argues that the evidence at trial contravened Morris's theory of the case. Specifically, it cites Plaintiff's counsel's comments during closing argument suggesting that Higginbotham had long "waited for an opportunity to fabricate a reason to discipline Plaintiff." Mot. at 17; see also Trial Tr. (11/1/17 AM) at 98:15-16 ("[T]his was the opportunity that Karen Higginbotham was waiting for. She jumps on it."). The undisputed evidence, the EPA says, "showed that Higginbotham previously had other opportunities to discipline Plaintiff and that she declined to do so." Mot. at 17. While the Court agrees that

Plaintiff's lie-in-wait theory is rather implausible, that alone does not doom her cause. A jury need not have found that Higginbotham had plotted all along to suspend Morris because her race. Rather, it would suffice to conclude, as the Court of Appeals allowed, that in the moment Higginbotham recommended the suspension, she was "motivated by discriminatory animus." Morris, 825 F.3d at 669.

### 2. *Causation*

That leaves the third and final <u>Staub</u> prong: whether "Higginbotham's racial bias" was a proximate cause of Morris's suspension. As before, the Court of Appeals previously weighed in on that question, holding that a reasonable jury "could find that [Spears's] decision was swayed by Higginbotham's subjective judgments." <u>Id.</u> at 673. It first noted that a jury could find that Higginbotham's proposed suspension directly caused Spears to act, as his written decision expressly noted that he was "approving the suspension 'as proposed by Ms. Higginbotham.'" <u>Id.</u> at 672. "The closer question," it thought, was "whether Spears's investigation was a superseding cause." <u>Id.</u> Although Spears had conducted his own inquiry into the incidents giving rise to the suspension, "mere conduct of an independent investigation" alone "does not break the causal chain." <u>Id.</u> (citation omitted). On this point, the Court of Appeals reasoned:

> A reasonable juror could determine that Higginbotham's report colored Spears's evaluation of the incident at hand. That report contained subjective observations that Morris had "difficulty getting along with others," was not "appropriately diplomatic," and had "acrimon[ious]" interactions with colleagues. Spears's suspension decision repeatedly referenced Higginbotham's report, and in fact expressly agreed with a portion of her assessment that considered subjective factors. EPA does not argue that Spears had personal knowledge of the facts underlying Higginbotham's subjective observations. . . . [A]lthough Spears considered some facts that were objectively verifiable—for example, the statements Morris made in her issue sheet—we cannot be confident that his decision was insulated from Higginbotham's subjective views.

Id. at 672-73 (internal citations omitted).

The Government nonetheless argues that "[t]he evidence at trial, . . . unlike at summary judgment, made clear that Spears's suspension decision was based on his own rigorous analysis of the evidence, his own direct observation of Plaintiff's insubordination, and his personal knowledge of Plaintiff's prior misconduct." JMOL Mot. at 12-13. It is true that Spears testified that he harbored his own "very real concerns" about Morris, see Trial Tr. (11/1/17 AM) at 32:1-6, including that he personally found her "Issue Sheet" to the HRC inappropriate and that he had been approached "by a number of managers who refused to have further dealings with the Office of Civil Rights if Ms. Morris was involved." Id. at 16:10-14, 28:1-5. He further stressed that he was "very concerned" about Morris's "tone" regarding Higginbotham, and that he "did not get the sense that Ms. Morris valued or viewed Ms. Higginbotham as capable or at least competent to supervise her." Id. at 24:1-12. Given that background, he testified to having independently concluded that the suspension was "the appropriate penalty for . . . what [he] viewed as a very serious breach." Id. at 31:2-4.

A reasonable jury was certainly entitled to credit Spears's testimony. The problem for the EPA, however, is that a reasonable jury could reach the opposite conclusion. Although Spears testified that "a number of managers" had raised problems about Morris, the Government offered no witnesses to corroborate that testimony (and, in fact, several disinterested witnesses testified to the contrary). Its case thus rose and fell with Spears's credibility. And during cross-examination, Spears gave the jury reason to doubt his candor, frequently butting heads with Plaintiff's counsel and being impeached by his own deposition testimony.

Most damningly, Plaintiff's counsel began by asking Spears whether he wrote the suspension decision. Id. at 33:17. Spears responded yes. Id. at 33:18. After being pressed,

14

however, he conceded that "the draft was prepared by the General Counsel's Office," while still insisting that he had "edited and signed it." Id. at 34:18-19. Counsel then brought up his deposition, at which Spears had admitted that he wrote "[a]lmost none" of the decision. Id. at 36:7. Backtracking, Spears then said on the stand that at his "level, [he] draft[s] almost nothing." Id. at 36:17. A reasonable jury might have viewed Spears as unnecessarily cagey about his role in drafting the document and wondered whether he was exaggerating the independence of his other investigatory measures as well.

Next, counsel questioned Spears about whether he and Higginbotham were "close personal friends." Id. at 36:22-23. Spears answered that that was "not correct," id. at 36:24, and, after a lengthy back and forth, maintained that at the time of the suspension, Higginbotham was nothing more than an "acquaintance[]." Id. at 38:21. Once again, the deposition showed otherwise; there, Spears gave an unqualified "yes" when asked whether he and Higginbotham were "personal friends." Id. at 39:17-25. When confronted with that prior testimony, Spears could only answer that he did not "recall" saying as much. Id. at 40:2. The Government now characterizes this dispute as "extremely petty," Reply at 3; but however trivial the difference between close personal friends, friends, and acquaintances may seem, the witness's reluctance to admit even a friendship with Higginbotham may have raised red flags with the jury.

Likewise, Spears dodged questions about whether he had ever followed up on any of Plaintiff's complaints about Higginbotham. In response to her proposed suspension, Morris submitted a letter (drafted by her lawyer) outlining numerous grievances against the supervisor, see Trial Tr. (11/1/17 AM) at 66, including Higginbotham's comments that the "little white woman better stand in line." Id. at 68:1-3. After somewhat inconsistent testimony, Spears insisted that he had reached out to Higginbotham about the incidents. Compare id. at 68:1-8 with

id. at 66:21-2 ("Question: Did you ever bring the things you learned from this memo, that would be the [] letter, to Ms. Higginbotham's attention?  Answer: No.").  Even accepting that as true, Spears still only asked <u>Higginbotham</u> about her reported disparaging comments, never once following up with other employees about the exchange.  <u>Id.</u> at 67-68.  A reasonable jury might be left with the impression that Spears was unduly deferential to Higgibotham's judgments and (once again) reluctant to admit as much on the stand.

All told, the evidence did not overwhelmingly favor either party.  Viewing the evidence in the light most favorable to Plaintiff, however, the following story unfolds:  Spears's "personal friend," Higginbotham, proposed a seven-day suspension, which he essentially rubber-stamped after making only minor edits to a draft prepared by the General Counsel's Office.  Spears sustained this suspension — just the second issued in his long career as a supervisor, <u>id.</u> at 41:1-6 — without following up on any allegation made in Plaintiff's memorandum, save by accepting Higginbotham's denials at face value.  On that record, a reasonable jury could discount Spears's protestations that he made the suspension independently and conclude, as the Court of Appeals anticipated, that his decision was not "insulated from Higginbotham's subjective views." <u>Morris</u>, 825 F.3d at 673.  This Court will therefore deny the Government's renewed Motion for Judgment as a Matter of Law.

B.      <u>Motion for New Trial</u>

Beyond seeking judgment outright, the Government also requests a replay.  It moves for a new trial, arguing principally that: (1) the verdict was against the weight of the evidence; (2) Plaintiff's counsel made several improper comments during closing arguments; (3) the Court erred by admitting the testimony of EPA employee Chris Emmanuel; and (4) Plaintiff's

testimony about Higginbotham's past hiring practices should not have come in.  The Court considers, and rejects, each claim in turn.

### 1. *Verdict Against Weight of Evidence*

In a single paragraph, the Government maintains that a "new trial is warranted [because the] verdict is against the weight of evidence."  JMOL Mot. at 24.  As one leading treatise has noted, "The power of a federal judge to grant a new trial on the ground that the verdict was against the weight of the evidence is clear. The standard that is to control in passing on motions of this kind is not."  Wright & Miller, 11 <u>Fed. Prac. & Proc. Civ.</u> § 2806 (3d ed. 2017).  At a minimum, though, a district judge cannot erase a verdict "simply because he would have come to a different conclusion if he were the trier of the facts."  <u>Lind v. Schenley Industries, Inc.</u>, 278 F.2d 79, 89 (3d Cir. 1960).  While the standard for a new trial may be "less onerous" than one for judgment as a matter of law, <u>Lewis v. Elliott</u>, 628 F. Supp. 512, 515-516 (D.D.C. 1986), the judge must still give "full respect" to the jury's verdict and be "left with the definite and firm conviction that a mistake has been committed."  Wright & Miller § 2806; <u>see also</u> <u>Springer v. Henry</u>, 432 F.3d 268, 274 (3d Cir. 2006) ("A new trial should be granted only where the great weight of the evidence cuts against the verdict and where a miscarriage of justice would result if the verdict were to stand.") (internal quotation marks omitted).

A court should be especially reluctant to disturb a jury verdict when "the trial involves simple issues [and] highly disputed facts."  <u>Williams v. City of Valdosta</u>, 689 F.2d 964, 974 (11th Cir. 1982); <u>see also</u> Wright & Miller § 2806 ("The more sharply the evidence conflicts, the more reluctant the judge should be to substitute his judgment for that of the jury.").  Such is the case here.  The issue — whether a supervisor suspended an employee based on racial animus — is readily accessible to laypeople.  The central dispute in this case, moreover, essentially turned

on credibility: whether the jury believed Higginbotham's and Spears's explanations for the suspension. The Government itself began its opening argument by telling the jury that "this case . . . [is] about character." Trial Tr. (10/30/17 AM) at 75:17-18. Although this Court might have come down the other way, "credibility determinations and the weighing of evidence are [best] left to juries rather than judges." United States v. $17,000.00 in U.S. Currency, 859 F.3d 1085, 1093 (D.C. Cir. 2017). It therefore declines to grant a new trial on the ground that the verdict was against the weight of the evidence.

### 2. Closing Argument

The Government next challenges two statements made by Plaintiff's counsel, David Shapiro, during closing argument. First, counsel vouched for the credibility of one of his witnesses, Alease Wright, saying: "Now, other than Ms. Higginbotham saying she's a liar, I don't know how does [*sic*] any evidence that you cannot believe Alease Wright? She seemed to me to be very believable." Trial Tr. (11/1/17 AM) at 91:3-6. Second, counsel vouched for the strength of his case, stating, "I would say there's a great deal of evidence of racial bias, more than you'll find in any case these days." Id. at 121:1-3.

There is no doubt that both of those comments were error. The D.C. Circuit has repeatedly made clear that "it [is] for the jury, and not the [lawyers], to say which witnesses [are] telling the truth. Neither counsel should assert to the jury what in essence is his opinion" on the ultimate issue. See United States v. Brown, 508 F.3d 1066, 1075 (D.C. Cir. 2007) (quoting Harris v. United States, 402 F.2d 656, 658 (D.C. Cir. 1968)); see also MODEL RULES OF PROF'L CONDUCT R. 3.4(e) (2002) (prohibiting a lawyer from "stat[ing] a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused"). As the Court said while reprimanding Shapiro at the bench,

"[V]ouching . . . doesn't get any more blatant" than those comments.  See Trial Tr. (11/1/17 AM) at 91:11-13.

A court cannot order a new trial, however, if the errors were "harmless."  Such is the case when "(1) the case is not close, (2) the issue not central, or (3) effective steps were taken to mitigate the effects of the error."  Caudle v. Dist. of Columbia, 707 F.3d 354, 362 (D.C. Cir. 2013) (quoting Ashcraft & Gerel v. Coady, 244 F.3d 948, 953 (D.C. Cir. 2001)).  Plaintiff does not dispute that this case was close or that her counsel's comments went to central issues in the case.  See Pl. Opp. at 10 n.2.  The only question, then, is whether this Court took effective steps to mitigate the error.  On this point, the D.C. Circuit has held that "[e]ven where a comment has the potential to prejudice the defendant, [it] give[s] significant weight to the district court's decision to provide a curative instruction and normally presume[s] that a jury will follow an instruction to disregard a prejudicial comment."  United States v. Wheeler, 753 F.3d 200, 206 (D.C. Cir. 2014) (internal quotation marks omitted).  "Keeping in mind that [a] mistrial is a severe remedy — a step to be avoided whenever possible, and one to be taken only in circumstances manifesting a necessity therefor" —  a curative instruction is the preferred remedy "unless there is an overwhelming probability that the jury will be unable to follow the court's instruction[] and a strong likelihood that the effect of the evidence would be devastating to the defendant."  Id. (alterations in original) (internal quotation marks omitted); see also United States v. McGill, 815 F.3d 846, 899 (D.C. Cir. 2016) ("We presume that juries follow the court's curative instructions unless there is reason to doubt compliance in a particular case.").

Here, the Court immediately sustained the Government's objection to Shapiro's comments about Alease Wright and then pointedly called Plaintiff's counsel to the bench (where it then took him to task for the violation).  See Trial Tr. (11/1/2017 AM) at 91:7-14.  Without any

request by the Government (for even a curative instruction, much less a mistrial), the Court then told the jury: "Ladies and gentleman, please disregard the comment. The attorneys may not vouch for the credibility of witnesses. The credibility of witnesses is for you to determine." Id. at 91:16-19. Chastened, counsel then conceded to the jury that "it's for you to view and your determination." Id. at 20-21.

The Court took the same approach after counsel's comment that there was a "great deal" of evidence to support his case. It forcefully sustained the Government's objection and, again without any request from the Government, instructed the jury: "Ladies and gentlemen, you're not comparing this to hypothetical cases. The question is this case, the evidence in this case." Id. at 121:5-8. Those targeted curative instructions were on top of the Court's more general charges to the jury. During opening instructions, the Court told the jury that they "alone determine the weight, the effect, and the value of the evidence, as well as the believability or credibility of the witnesses." Trial Tr. (10/30/17 AM) at 67:3-5. During closing instructions, it again emphasized that the jury "alone decide[s] the credibility or believability of the witnesses." Trial Tr. (11/1/17 AM) at 76:17-22.

The D.C. Circuit has allowed less to cure even more egregious vouching. In Brown, for instance, the "prosecutor repeatedly stated that he 'believed' various Government witnesses" during closing arguments. See 508 F.3d at 1074. As to one such witness, the prosecutor stated:

> I believe the evidence and the testimony of Mrs. Ana Alvarez Rios, I believe her testimony regarding this defendant and his actions proves him guilty beyond a reasonable doubt. And her testimony had a ring of truth or a ring of trustworthiness that you could take to the bank.

Id. The Court of Appeals, naturally enough, deemed those comments a "serious error" and one that was "particularly dangerous" because "it [was] done by prosecutors." Id. at 1075 ("[T]he prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to

trust the Government's judgment rather than its own view of the evidence.") (quoting United States v. Young, 470 U.S. 1, 18-19 (1985)) (emphasis omitted). The court nevertheless found the trial court had cured the prejudice by giving general instructions to the jury that they were "the sole judges of the facts" and that "[t]he statements and arguments of the lawyers are not evidence." Id. at 1076 (internal quotation marks omitted). Although the court there reviewed only for plain error, it made clear that had the defense objected, and the trial court had "instruct[ed] the jury to disregard his expressions of personal belief," it could have "render[ed] any error harmless." Id.

At bottom, courts "presume that a jury will follow an instruction" absent "overwhelming evidence to the contrary and "a strong likelihood that the effect of the evidence would be devastating to the defendant." Greer v. Miller, 483 U.S. 756, 766 n.8 (1987) (internal quotation marks omitted); see, e.g., United States v. Reed, 522 F.3d 354, 359-60 (D.C. Cir. 2008) (holding that even though prosecutor plainly erred by invoking Jesse James and Billy the Kid during closing argument, court's instruction that the jury "alone [is] to determine whether to believe any witness" had "mitigated any harm caused by the statements"); see also Wheeler, 753 F.3d at 206-07 (holding that curative instructions had cured two inflammatory remarks by prosecutor, including one during closing argument implying that jurors (as taxpayers) "were the victims of [the defendant's] fraud"). The Court sees no reason to buck the trend here.

The Government cites one case as an exception to that general rule, Caudle, 707 F.3d 354. There, the plaintiff's counsel made four objectionable statements — three were variants on a "Golden Rule argument," which asks "jurors to place themselves in the position of a party," while a fourth effectively asked jurors to "send a message" with their verdict. Id. at 359, 361. The Court of Appeals found the district court's single curative instruction insufficient to offset

the resulting prejudice. Id. at 362. The Government seeks the same result in this case, but Caudle is readily distinguishable. As an initial matter, the court there had good reason to suspect "emotion" played a role in the jury's verdict: "[D]espite the fact that the [plaintiff's] damages evidence was tenuous at best, the jury awarded almost one million dollars." Id. at 362 & n.8 (noting that although plaintiffs challenged their job reassignments as discriminatory, one plaintiff had in fact been promoted). Here, by contrast, the jury's relatively modest award of $25,000 suggests that the same "passion and prejudice" were not at play. Id. at 362 (quoting Whitehead v. Food Max of Miss., Inc., 163 F.3d 265, 278 (5th Cir. 1998)).

More important, the trial court in Caudle twice rejected requests for a curative instruction following the counsel's Golden Rule arguments. Id. at 358. It was only after the third such improper statement that the trial judge intervened by instructing the jury to disregard it. Id. at 359. Such efforts were too little, too late, as counsel's repeated impermissible remarks — "each escalating from the last" — had already done significant damage. Id. at 363. Here, on the other hand, the Court immediately sustained both of Defendant's objections and issued — without request — curative instructions, thereby underscoring to the jury how improper such comments were. See McGill, 815 F.3d at 926 (noting that "prompt curative instructions" can prevent prejudice "from rising to the high level required to warrant a mistrial or severance").

The Government argues that Plaintiff's counsel made other comments of a similar vein, telling juries earlier in his closing that "in these sorts of cases . . . [u]sually people don't announce their intent, they don't use racially charged or sex based charged language." Trial Tr. (11/1/17 AM) at 88:1-4. The defense did not object to such prior comments, so the Court had little opportunity to issue immediate curative instructions. To the extent they caused damage, however, the Court cured such prejudice as soon as the Government objected, making clear that

the jury should not compare this case to a hypothetical one. <u>Id.</u> at 121:5-8 ("Ladies and gentlemen, you're not comparing this to hypothetical cases. The question is this case, the evidence in this case."). The case is thus a far cry from <u>Caudle</u>, where the Court of Appeals found it significant that counsel "made <u>four</u> impermissible statements . . . three of which came <u>after</u> the district court had sustained the District's objections." 707 F.3d at 363 (second emphasis added). The jury there would necessarily be confused about <u>why</u> the trial judge had sustained an objection (without explanation) to the first Golden Rule argument, only to see counsel continue pressing the exact same point. Conversely, improper though Shapiro's statements were, he ceased making any arguments in a similar vein as soon as the Court instructed the jury otherwise. The Court's curative instructions were thus the last word on the topic and sufficient to mitigate any prejudice. <u>Cf.</u> <u>Stokes v. Delcambre</u>, 710 F.2d 1120, 1128 (5th Cir. 1983) (finding no plain error because "no repeated impermissible use of the argument technique"). Indeed, the Government did not deem those errors so pernicious as to request a new trial at the time, and the Court declines to impose such an extreme remedy now.

That is not to say that Plaintiff's counsel behaved appropriately. Far from it. As an experienced litigator, Shapiro certainly knew better than to vouch for the credibility of his case or witnesses. The Court is surprised that he would nonetheless engage in such tactics. That is particularly so given that another court has apparently chastised him for "express[ing his] views" during closing argument. <u>See</u> Def. Reply, Exh. B (excerpts of <u>Coleman-Adebayo v. Browner</u>, No. 98-926, during which court, after sustaining multiple objections to closing argument, reminded counsel: "It's so easy not to inject yourself into this. Please don't do it."). Although the errors were harmless in this case, the Court emphasizes that these sort of statements

contravene counsel's duty to "play the game according to the rules," <u>Caudle</u>, 707 F.3d at 363 (citation omitted). Repetition in the future may yield a less favorable result.

### 3. Chris Emmanuel's Testimony

The Government next attacks the testimony of one of Plaintiff's former subordinates, Chris Emmanuel. Emmanuel testified that when he was new to OCR, Higginbotham called him to her office, ostensibly to discuss their mutual experiences in sororities and fraternities. <u>See</u> Trial Tr. (10/31/17 PM) at 100:22-25. While there, however, she advised Emmanuel (who is black) that he should "just keep [his] head down because I'm going after [Morris]." <u>Id.</u> at 101:25-102:8. The EPA cries foul on several grounds. First, it says that the Court should have barred Emmanuel from taking the stand at all or at least excluded certain portions of that testimony. <u>See</u> JMOL Mot. at 33-37. Second, it argues that it should have received a continuance so that it could properly prepare for the testimony. <u>Id.</u> at 37-38. The Court disagrees on both scores.

#### a. Admissibility

Defendant first maintains that Emmanuel's entire testimony was both irrelevant and highly prejudicial, such that it was inadmissible under Federal Rules of Evidence 401 and 403. Per Rule 401, evidence is relevant if "it has any tendency to make a fact more or less probable," and under Rule 403, it is admissible unless "its probative value is substantially outweighed by . . . unfair prejudice." Defendant deems Emmanuel's testimony inadmissible because there was no inherent "racial connotation to the alleged statement that Higginbotham was 'going after' Plaintiff." JMOL Mot. at 35. While the statement, standing alone, might not suggest racial bias, it was relevant for a different reason: to show pretext. Upon hearing this testimony, a jury might

think it more probable that Higginbotham suspended Morris because of a plan to "go[] after" her, rather than her alleged insubordination.  See FRE 401.

Of course, that alone would not carry Plaintiff home, as she still needed to show that Higginbotham was "going after" her because of race, rather than personal animus.  See Prince v. Rice, 570 F. Supp. 2d 123, 134 (D.D.C. 2008) (fact that supervisor "harbored some personal animus towards [plaintiff] . . . alone is not enough to establish discrimination on the basis of race").  Morris could do so, however, by coupling Emmanuel's testimony with other evidence of racial bias.  Cf. O'Shea v. Yellow Tech. Servs., Inc., 185 F.3d 1093, 1097 (10th Cir. 1999) ("All instances of harassment need not be stamped with signs of overt discrimination to be relevant under Title VII if they are part of a course of conduct which is tied to evidence of discriminatory animus.") (citation omitted); DeJesus v. WP Co., LLC, 841 F.3d 527, 535-36 (D.C. Cir. 2016) (noting employer's condescension toward black employee, along with coded racial language, could show discriminatory intent).  And the fact that Emmanuel's testimony, by itself, did not suffice to show racial discrimination did not render it inadmissible.  Rather, in combination with other racially charged remarks, the Court deemed it relevant to show that Higginbotham planned to act on her racial animus.  Taken in this context, any prejudice from such testimony did not substantially overshadow its probative value.

Alternatively, the Government claims that the Court should have at least excluded Emmanuel's additional testimony to his "personal opinion . . . that Higginbotham would have had 'no problem at all' with Plaintiff if [she] were African-American."  JMOL Mot. at 36.  It points out, correctly, that lay opinions based on "naked speculation" about an employer's racial bias are generally inadmissible without a foundation to support that inference.  See, e.g., Hester v. BIC Corp., 225 F.3d 178, 184-85 (2d Cir. 2000).  Even were that the case here, however, the

Government runs into a roadblock: it expressly _invited_ such testimony by asking: "Isn't it true that, in your opinion, the disagreement between Ms. Morris and Ms. Higginbotham was primarily a personality clash?"  Trial Tr. (10/31/17 AM) at 105:18-20.  It was only then that Emmanuel responded: "[A]ctually, in really thinking about it, I just know that, had Ms. Morris not been white, that personality clash wouldn't exist."  Id. at 105:22-24.  Having opened the door to Emmanuel's "opinion" about Higginbotham's motivations, the Government cannot now complain about his unhelpful answer, particularly where they did not move for it to be stricken.

     b. Continuance

   Defendant alternatively argues that the Court should have granted a continuance to allow counsel to prepare for Emmanuel's testimony.  During its pre-trial conference, the Court had barred Plaintiff from presenting other evidence of Higginbotham's bad acts, including Emmanuel's testimony.  See Trial Tr. (10/30/17 AM) at 6:11-20.  On the morning of trial, however, counsel nevertheless prepared to call him, apparently misunderstanding the scope of the Court's pre-trial ruling.  Id. at 7.  After hearing argument from both parties, the Court determined that it had erred in deeming Emmanuel's testimony inadmissible and decided to allow him to take the stand for the reasons described above.  Id. at 13:14-19.

   Although the Court sympathized with Defendant's request for a continuance, it deemed such disruption unnecessary to prepare for cross.  Id. at 14:14-19.  Emmanuel's testimony, it pointed out, would last mere minutes and center on a single incriminating statement.  Id. at 14:7-10.  The Government had long known about the "going after" remark, as it had challenged that very same testimony during the pre-trial proceeding.  See Trial Tr. (10/30/17 PM) at 4:13-23.  The Court reasoned that the time needed to prepare for cross was "minimal," as the issues were fairly straightforward, and the Government could largely reprise the arguments already presented

to the Court (*e.g.*, that Higginbotham had never mentioned race during the conversation and that the exchange occurred years before the suspension). See Trial Tr. (10/30/17 AM) at 14:9-12.

Having watched Emmanuel's testimony unfold, the Court continues to believe that a continuance was unnecessary. That is particularly so as Plaintiff did not call Emmanuel to the stand until the following day, effectively giving the Government an overnight continuance to prepare. Given that Emmanuel's direct examination was limited to his (undisputed) background as an EPA employee, the relatively uncontroversial context for his conversation with Higginbotham, and the single relevant comment about Morris, see Trial Tr. (10/31/17 AM) at 92-104, the Court finds that break provided sufficient time to prepare.

### 4. *Higginbotham's Hiring Practices*

Not done yet, Defendant also challenges the admissibility of Morris's testimony related to the demographics of the OCR workforce, as well as testimony related to Higginbotham's hiring practices. On the former, the Government specifically objects to evidence that Morris was the only white female among 35 employees at OCR headquarters. See Trial Tr. (10/30/17 AM) at 104:10-17. The Government sees such assertion as improper because the trial "involved no gender discrimination claim." JMOL Mot. at 38. True enough, but Plaintiff could appropriately introduce such evidence for a different purpose: to provide context for Alease Wright's testimony that Higgonbotham had once said, "[T]hat little white woman better stand in line." Trial Tr. (10/31/17 AM) at 60:3-4. Such statements take on added import once the jury knows that Morris was the only such "white woman" in the office. While Plaintiff may have unduly emphasized that the office had 35 employees, any error in so testifying is harmless because that information would (as discussed below) have come in independently.

The Government finds a bit more traction in challenging questions related to Higginbotham's hiring practices. Plaintiff explored that avenue on three separate occasions, and the Court discusses each sequentially. First, Morris directly testified that Higginbotham had not personally hired her or any other white women. See Trial Tr. (10/30/17 AM) at 104:23-107:6. The Government objected, arguing broadly that any evidence of Higginbotham's hiring practices was inappropriate outside of a non-selection case. Id. at 105:4-25. On the contrary, however, the D.C. Circuit has repeatedly held that "when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." Waterhouse v. Dist. of Columbia, 298 F.3d 989, 996 (D.C. Cir. 2002) (quoting Grady v. Affiliated Ctr., Inc., 130 F.3d 553, 560 (2d Cir. 1997)). By the same token, Plaintiff could show evidence that Higginbotham was not the person who had hired her, in order to head off any questions on that ground.

Similarly, the D.C. Circuit has noted that "[a]n individual who is willing to hire and promote a person of a certain class is unlikely to fire them simply because they are a member of that class." Id. (quoting Buhrmaster v. Overnite Transp. Co., 61 F.3d 461, 464 (6th Cir. 1995)). The converse is also probative: an individual who is unwilling to hire and promote certain classes might be more likely to suspend people simply because they are a member of that class. Put another way, disparate hiring might suggest a general racial bias, and a general racial bias might also infect that person's other personnel decisions. See Dejesus, 841 F.3d at 536 ("[A] reasonable jury could treat evidence of a decisionmaker's broad-based racial animus or bias as corroborating evidence that such animus or bias infected a particular employment decision."). This Court therefore found Higginbotham's hiring practices were relevant as "evidence of discriminatory . . . attitudes on the part of the employer." Aka, 156 F.3d at 1289.

Notably, at this point, the Government did not raise any question about Plaintiff's reference to gender or point out that Higginbotham had hired white men.  It simply objected to any evidence related to her hiring decisions.  Nor did it argue, as it does now, that Morris failed to present a baseline comparison — *i.e.*, how many white people had applied for the job.  See JMOL Mot. 39-40.  While such failure limited the import of Plaintiff's hiring evidence, the Government could have easily raised such shortcomings during its own cross-examination, and, indeed, it later elicited such testimony from Higginbotham.  See Trial Tr. (10/31/17 AM) at 121:21-122:22 (testifying she made five or six hires, three of whom were white).  Against that backdrop, the Court found the evidence more probative than prejudicial and allowed a brief colloquy on the subject.

Plaintiff next spotlighted Higginbotham's hiring practices later in the afternoon.  See Trial Tr. (10/30/17 PM) at 40:25-41:1.  The Government did not object here, and for good reason, as Morris had an independent rationale for this line of inquiry: to show bias on the part of Ray Spears.  As the reader may recall, it was Spears — not Higginbotham — who ultimately suspended Morris.  Plaintiff therefore needed to establish liability either under a cat's-paw theory (as discussed above) or show that Spears himself harbored racial bias.  See Morris, 825 F.3d at 673 (noting Morris's "alternative theory that Spears was independently motivated by racial bias").  In pursuing this latter ground, Plaintiff adduced testimony that Spears had once asked Higginbotham, "What are you doing hiring all these white people down in your office?"  Trial Tr. (10/30/17 PM) at 39:24-40:1.  At other points, testimony showed Spears had asked, "[W]hy are you hiring so many white guys?" or that he had remarked about the "number of white males" in the office.  See Trial Tr. (10/31/2017 PM) at 90:23-92:12.  Much of Plaintiff's testimony about hiring evidence came on the heels of that discussion and was thus relevant to Spears's

racial bias: it was significant that despite his assertion that Higginbotham was hiring "all these white people" or "white guys," she had in fact selected only three white men (and no white females) of 35 OCR employees.

Finally, counsel returned once again to hiring when Higginbotham took the stand, asking her directly whether she had hired any white person, and then whether she had hired any white women. See Id. at 100:4-9. The Government objected to this latter question, and this time it did so on the ground that the case was "only about race discrimination and not gender." Id. at 100:15-18. With the benefit of earlier testimony, the Court (and the jury) now knew that Higginbotham had in fact hired three white men. It thereby deemed any argument about hiring "white women" irrelevant and potentially misleading. Although the Government did not request a curative instruction, the Court did warn Plaintiff's counsel that if he broached the subject again, it would *sua sponte* instruct the jury to disregard it. Id. at 100:19-25. So warned, Plaintiff's counsel steered clear of any more questions related to the hiring of white females.

To summarize, then, the Court sustained the Government's objection as soon as it specifically raised an argument about hiring "white women." To the extent the Government preserved any error from Morris's earlier testimony, it was harmless. True, the case was close, and "a court should be especially loath to regard any error as harmless" in such circumstances. United States v. Colombo, 909 F.2d 711, 714 (2d Cir. 1990) (internal quotation marks omitted). Even in close cases, however, not every error automatically warrants a new trial, as the Court must also look to whether the disputed testimony relates to a "central" issue. See Caudle, 707 F.3d at 362. Here, the inculpatory portion of Plaintiff's testimony was largely that Higginbotham might discriminate in hiring white people; a few scattered references to her hiring white women seems unlikely to tip the scales, even in an otherwise close case. That is especially

so because Plaintiff abandoned that line of inquiry after direction from the Court, and in its closing, the Government made clear that any reference to hiring white woman was "just another distraction," as "[t]here is no gender discrimination claim in this case, only a race claim."  Trial Tr. (11/1/17 AM) 113:4-8.  The Court deems it farfetched that any lingering confusion about a few lines of testimony swayed the jury's verdict.

### 5.  *Other Arguments*

Last and certainly least, Defendant raises — in footnotes — a few scattered arguments, which the Court can dismiss in short order.  First, it contends that "[f]or many of the same reasons that the Emmanuel testimony was inadmissible," testimony regarding another incident in which "Higginbotham did not treat Plaintiff well . . . [was] likewise inadmissible."  JMOL Mot. at 38 n.5.  The Government refers to testimony that a low-level EPA employee, Stephanie McCoy, called Plaintiff a "low life" and "bitch," yet Higginbotham did nothing to discipline McCoy upon hearing of the incident.  Id.; see also Trial Tr. (10/30/17 PM) at 34-36.

As an initial matter, an argument "found in a single footnote . . . is not enough to raise an issue."  NSTAR Elec. & Gas Corp. v. FERC, 481 F.3d 794, 800 (D.C Cir. 2007); see also Sugar Cane Growers Co–Op. of Florida v. Veneman, 289 F.3d 89, 93 n.3 (D.C. Cir. 2002) ("[A]ppellants failed to raise their . . . claim — a footnote at the end of their opening brief does not suffice.").  In any event, the Court finds the incident admissible.  McCoy, a black woman, arguably committed a far graver sin than Plaintiff by calling her superior a "bitch," and yet received no punishment.  Beyond showing general animus, that sort of disparate treatment is probative.

Next, the Government highlights that, after deliberating for about three hours, the jury sent out a note stating: "We the jury have been unable to reach a unanimous decision and feel we

are not able to reach a consensus regarding the verdict." JMOL Mot. at 28 (citing Trial Tr. (11/2/17 AM) at 2:3-8). The Court informed the parties as much, proposed to tell the jury "to keep deliberating," and noted it would consider a more detailed charge at a later time. Id. at 2:6-13. It solicited objections from either party, id. at 2:10-15, but with none forthcoming, the Court instructed the jury to "please continue your deliberations." Id. at 2:23-25, 3:1. The Government now "note[s]" that the Court's instruction did not follow the one "approved by the D.C. Circuit for such situations." JMOL Mot. at 28 n.3. Even were that single footnote sufficient to raise this issue, the EPA already waived such argument by failing to raise any objection to the jury instruction at trial. See Hankerson v. North Carolina, 432 U.S. 235, 244 n.8 (1977) "[F]ailure to object to a jury instruction is a waiver of any claim of error.").

Finally, in the same footnote, Defendant mentions that the jury "revealed in post-trial discussions with counsel [that] the verdict for Plaintiff was a 'compromise' reached because the jurors could not resolve their four-to-four disagreement." JMOL Mot. at 28 n.3. The Court allowed the attorneys to meet with the jurors post-trial as a courtesy, during which the jury can (and did) explain which witnesses it found believable, which tactics played best, and why it found in Plaintiff's favor. To the extent the Government wants to impeach the verdict based on those discussions, it should know better. It is well established that "after the verdict [is] entered," jurors cannot testify "either about their subjective mental processes or about objective events that occurred during deliberation." Pena-Rodriguez v. Colorado, 137 S. Ct. 855, 863 (2017). That rule is subject only to "limited exceptions," such as "where the jury had considered prejudicial extraneous evidence," "was subject to other outside influence," or was improperly influenced by racial animus. Id. at 864, 869. No exception applies here, and the Court must therefore disregard any juror's post-trial assessment of their deliberations.

* * *

All told, "there are no perfect trials." <u>Brown v. United States</u>, 411 U.S. 223, 132 (1973). This trial — although not so error-laden as the Government would maintain — is no exception to that general rule. Even in the aggregate, however, the errors in this trial related to relatively minor issues or were sufficiently mitigated by curative instructions. The Court notes that the Government should also look in the mirror, as some questionable trial tactics — *e.g.*, unduly demonizing Morris in its opening statement without ensuing evidentiary support, failing to pull the sting on critical contradictions during Higginbotham's direct examination, and reading a closing statement that never responded to key points of Plaintiff's closing — likely did not assist its cause.

## IV.   Conclusion

For the foregoing reasons, the Court will deny the Government's Motion, thereby sustaining the jury verdict. It will issue a contemporaneous Order so stating.

<u>/s/</u> *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  <u>April 3, 2018</u>