# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

**SUSAN M. MORRIS,**

    **Plaintiff,**

      **v.**

**ANDREW WHEELER, in his official capacity as Acting Administrator, U.S. Environmental Protection Agency,**

    **Defendant.**

</td><td>

**Civil Action No. 11-701 (JEB)**

</td></tr>
</table>

## MEMORANDUM OPINION

In 2011, Plaintiff Susan Morris filed this lawsuit against her former employer, the Environmental Protection Agency, principally alleging that she was fired because of her race. Seven years later, the case went to trial on a much narrower issue: whether a seven-day suspension Morris suffered several years before her termination was discriminatory. A jury decided that it was and awarded her $25,000 in damages. All that is left now is Plaintiff's Motion for Equitable Relief. Here, she asks the Court to order alterations to her personnel file, require backpay and reinstatement, and award her nearly $500,000 in attorney fees and costs. Concluding that Morris is entitled to some — but not all — of the relief she seeks, the Court grants in part and denies in part the Motion.

## I.      Background

The relevant facts and history of this litigation are known to any reader of the past Opinions in this case. See, e.g., Morris v. McCarthy, 825 F.3d 658 (D.C. Cir. 2016); Morris v. Pruitt, 308 F. Supp. 3d 153 (D.D.C. 2018). The Court nevertheless returns to the field of battle to provide necessary context for the parties' dispute over equitable relief. The facts underlying this

1

suit — as elicited at trial — are recounted first before the procedural history is described in some detail.

A. <u>Factual Background</u>

Susan Morris is a white woman who used to work as a supervisory program manager at EPA's Office of Civil Rights. <u>See</u> Trial Tr. (10/30/17 AM) at 98:6–98:24, 104:10–104:17. Things seemed to be going well for her in that role until a conference call in August 2007. <u>See</u> Trial Tr. (10/30/17 PM) at 52:9–25. The subject of the fateful call was a new advisory group Morris was involved in organizing for EPA's gay and lesbian employees. <u>Id.</u> at 54:11–19.

Unlike the dreary conference calls common in the professional world, this one was heated. <u>Id.</u> at 66:1–8. The source of the clash was Plaintiff's disagreement with EPA employee Nancy Tommelleo about what the group should be named. While the call lasted only thirty minutes, its fallout would be felt for months. Tommelleo, upset with how she felt Morris had treated her, sent her supervisor a memorandum criticizing her behavior during the call. <u>Id.</u> at 76:6–77:17. The supervisor then drafted her own memorandum summarizing the concerns about Morris and sent it along with Tommelleo's to Morris's supervisor, Karen Higginbotham. <u>Id.</u> at 79:23–82:9. Higginbotham, a black woman who was then the Director of EPA's Office of Civil Rights, did not immediately give Morris copies of the memos. <u>Id.</u> at 67:21–70:12. When she sent her the memos several months later, Higginbotham directed Morris not to respond to them; rather, she would address the matter herself. <u>Id.</u> at 73:21–74:22.

Some months later, after Higginbotham had still not acted, Morris sent an issue paper to EPA's Human Resources Council, an advisory group tasked with counseling the EPA administrator on various HR matters. <u>Id.</u> at 86:5–91:24. The paper mentioned, among other subjects, the memos written by Tommelleo and her supervisor. <u>Id.</u> at 94:2–96:22; Trial Tr.

(10/31/17 AM) at 21:21–23:18.  Higginbotham testified that she interpreted the paper as a response to those memos and, accordingly, that she felt Morris had been insubordinate.  See Trial Tr. (10/31/17 PM) at 15:5–19:2.  She recommended that Morris receive a seven-day suspension without pay, which EPA Deputy Chief of Staff Ray Spears approved.  Id. at 18:2–22; Trial Tr. (11/1/17) at 22:22–24:6.  Several years after the suspension, Plaintiff was terminated from her position at EPA, allegedly for multiple instances of misconduct.  See ECF No. 95 (Mot.), Exh. 3 (Removal Letter) at 1.

Morris's time at EPA was marked by more than disputes over insubordination, according to testimony from her and her co-workers.  During the decade or so she worked there, Plaintiff and other employees witnessed Higginbotham make derogatory remarks about white employees.  One employee testified that Higginbotham said of Morris, "That little white woman better stand in line."  Trial Tr. (10/31/17 AM) at 60:1–4.  Morris testified that her supervisor had also referred to several interns at EPA as "little nasty white boys."  Trial Tr. (10/30/17 PM) at 25:18–25. (Higginbotham denied making such remarks.  See Trial Tr. (10/31/17 PM) at 25:20–26:25.)  In light of these and other statements, Morris believed that the adverse employment actions she suffered — viz., her suspension and subsequent termination — were racially motivated.

B.  Procedural Background

Aggrieved by her treatment at EPA, Morris sought relief in different fora.  She went the administrative route first, pursuing her suspension through an Equal Employment Opportunity Counselor and her termination through the Merit Systems Protection Board.  See ECF No. 9 (Opp. to MTD), Exh. 1 (EEO Report); ECF 6 (MTD), Exh. 9 (MSPB Decision).  When she had no luck there, she brought this suit in district court on April 8, 2011.  See ECF No. 1 (Compl.). The initial Complaint, which Morris filed pro se, sought relief on four counts — retaliation in

violation of Title VII, termination on the basis of gender in violation of Title VII, termination on the basis of race in violation of Title VII, and termination on the basis of age in violation of the Age Discrimination in Employment Act.  See Compl., ¶¶ 61–97.  About a month later, attorney David H. Shapiro entered an appearance on Morris's behalf.  See ECF No. 3.  With new counsel, Plaintiff subsequently filed an Amended Complaint alleging, in addition to the previous claims and several other new ones, that she had received the seven-day suspension in 2008 because of her age, sex, and gender.  See ECF No. 4 (Amended Complaint), ¶¶ 11, 19–20.

The Government moved for dismissal and summary judgment on various grounds.  See ECF No. 6 (MTD, MSJ).  Agreeing in part, Judge Rosemary M. Collyer, to whom the case was initially assigned, dismissed or granted summary judgment to EPA on everything except Morris's suspension claims.  See Morris v. Jackson, 842 F. Supp. 2d 171 (D.D.C. 2012).  The case then proceeded to discovery, after which the Government filed a motion for summary judgment.  See ECF No. 31 (MSJ).  Siding with EPA, Judge Collyer granted that motion, thus terminating the case, and Plaintiff appealed.  See Morris v. Jackson, 15 F. Supp. 3d 94 (D.D.C. 2014); ECF No. 44 (Notice of Appeal).  The Court of Appeals affirmed most of the district court's decisions, but it reversed the grant of summary judgment and remanded for trial one claim: that Morris's suspension was racially discriminatory.  See Morris, 825 F.3d at 663.  Before trial, the case was reassigned to this Court.  See ECF No. 59.

After the parties filed pretrial statements and the Court ruled on pretrial motions, the matter proceeded to trial.  See ECF No. 60 (Pretrial Statement); Minute Order of 10/18/2017. The jury issued a verdict in favor of Plaintiff and awarded her $25,000 in damages.  See ECF No. 73 (Clerk's Judgment).  Defendant then filed a motion for judgment as a matter of law, which the Court denied.  See ECF No. 79 (Renewed Motion for JMOL); Morris, 308 F. Supp. 3d 153.

Now, after seven years of motions, only Plaintiff's Motion for Equitable Relief remains.  <u>See</u> ECF No. 95.

## II.     Analysis

Title VII entitles individuals to be "[made] whole for injuries suffered on account of unlawful employment discrimination."  <u>Albemarle Paper Co. v. Moody</u>, 422 U.S. 405, 418 (1975).  To effectuate this purpose, "Congress took care to arm the courts with full equitable powers" so that the injured party may be "placed, as near as may be, in the situation he [or she] would have occupied if the wrong had not been committed."  <u>Id.</u> at 418–19 (citation and internal quotation marks omitted); <u>see</u> <u>Lander v. Lujan</u>, 888 F.2d 153, 156 (D.C. Cir. 1989).  The district court has "considerable discretion" in choosing the method or methods of redress, <u>Lander</u>, 888 F.2d at 156, although this discretion must be exercised "in light of the large objectives of [Title VII]."  <u>Albemarle Paper</u>, 422 U.S. at 416.  In determining appropriate "make-whole relief," the court "may make factual findings . . . as long as the findings are consistent with the jury verdict."  <u>Porter v. Natsios</u>, 414 F.3d 13, 21 (D.C. Cir. 2005) (internal quotation marks and citation omitted).  Among the forms of equitable relief authorized by Title VII are reinstatement, backpay, and attorney fees.  <u>See</u> 42 U.S.C. § 2000e-5(g)(1), (k).

Plaintiff returns to the Court seeking several categories of such relief.  First, she asks for an order that EPA expunge from her personnel file any record of her seven-day suspension and award her backpay for that period.  Second, Morris seeks an order that EPA void her subsequent termination, restore her to her previous position, and provide her backpay from the time of her termination in 2011 to the present.  Third, she requests attorney fees and litigation costs.  Addressing each request in turn, the Court disagrees with Plaintiff's first and second demands but grants her most of the fees and costs.

A. Suspension

Up first is the question of whether Morris is entitled to expungement of the seven-day suspension from her record and backpay for those days. Plaintiff says obviously yes: The jury agreed with her that the suspension was discriminatory, so she is entitled to have her personnel file altered and backpay awarded. The Government says no: The jury did not necessarily conclude that race was the but-for cause of her suspension, so she is not entitled to such relief. The dispute thus turns on Title VII's causation standard and how it relates to the propriety of certain forms of equitable relief. Applying that standard to the facts of this case, the Court finds that Morris is not entitled to this relief.

Plaintiffs can prevail in Title VII discrimination cases if they show that a protected characteristic — e.g., race, sex, or national origin — was "a motivating factor" for an adverse employment action. See 42 U.S.C. § 2000e-2(m). In such cases, the plaintiffs need not prove that discrimination was the but-for cause of the action and instead can succeed merely on a showing that "unlawful discrimination was 'a factor motivating the adverse action.'" Ponce v. Billington, 679 F.3d 840, 844 (D.C. Cir. 2012) (quoting Ginger v. District of Columbia, 527 F.3d 1340, 1345 (D.C. Cir. 2008)) (emphasis added). Although the Act allows for a finding of liability and compensatory damages under this lenient causation standard, it gives employers a limited affirmative defense as to certain equitable remedies if the more stringent but-for causation standard is not met. See Porter, 414 F.3d at 18–19. To wit, if an employer demonstrates that it "would have taken the same action in the absence of the impermissible motivating factor," the court may not award the plaintiff backpay or reinstatement on account of the employment action, even if it was a violation of Title VII. See 42 U.S.C. § 2000e-5(g)(2)(B); see also Fogg v. Gonzales, 492 F.3d 447, 454 (D.C. Cir. 2007).

In accord with these principles, the jury in this case was instructed that it could find Defendant liable and award damages if "race was a motivating factor" in its decision to suspend Morris. See ECF No. 72 (Jury Instructions) at 7. The jury found that it was and awarded her $25,000 in compensatory damages. See ECF No. 71. Now, Plaintiff asks for the equitable relief of expungement of the suspension from her record and backpay. The question for the Court is whether EPA has shown that it would have suspended her regardless of her race, such that the relief she seeks should not be awarded. This inquiry, it seems prudent to acknowledge, is an unusual one for a district court to undertake at this point. The jury has already spoken as to Defendant's liability and compensatory damages, but the Court is nevertheless left to make further factual findings about its conduct in order to determine the propriety of equitable relief. Yet that is the inquiry that Congress directed and the D.C. Circuit has affirmed in cases like this one. See 42 U.S.C. § 2000e-5(g)(2)(B); see also Fogg, 492 F.3d at 459 & n.6 (Henderson, J., concurring) (explaining that D.C. Circuit affirmed the district court's decision on issue at remedies phase in Porter "as part of its assessment of [] appropriate equitable relief") (quoting 414 F.3d at 21). The Court also notes that because the parties have not offered further evidence on this issue beyond the testimony elicited at trial, it looks solely to the transcript.

Having reviewed this trial evidence, the Court sides with EPA: Morris would have received the same seven-day suspension even if the agency had not considered her race. The principal reason is simple: Defendant's justification for the suspension — *viz.*, Morris's act of insubordination in responding to the critical memos — was legitimate and persuasive. When Higginbotham sent Morris the memos that criticized her behavior on the conference call several months before, she told her, "Do not respond to this memo." ECF No. 79, Attach. 6 (Joint Trial Exh. 4) at 1 (emphasis in original); see Trial Tr. (10/30/17 PM) at 83:15–20. What happened

next?  Several months later, Morris drafted a nine-page document — termed an "issue paper" — that referenced the memos numerous times and sent it to the Human Resources Council, a group of high-level EPA officials.  See ECF No. 79, Attach. 7 (Joint Trial Exh. 5); id., Attach. 8 (Joint Trial Exh. 6).

Higginbotham, in the Court's view, reasonably considered the document to constitute a response to the memos.  The issue paper contains four sections — Issues, Background, EEOS Issues, and Next Steps — and each references or discusses the memos.  To start, one of the two issues it purports to address is: "Harming or attempting to destroy the reputation, authority, and official standing of a senior female EEO official at EPA HQs."  Joint Trial Exh. 6 at 1.  Next, the Background section of the issue paper explains in some detail the content of Nancy Tommelleo's and Mary Wilkes's memos.  Id. at 1–2.  In fact, those memos are appended at the end.  Id. at 11–14.  The EEO Issues section contains one paragraph criticizing the memos at length.  It says, for example, that "[t]he memos . . . included false allegations with the intent of harming or attempting to destroy her credibility, authority, and official standing within the agency."  Id. at 7.  It further says that the individuals who wrote the memos are outside "her Chain of Command" and do not have "authority or responsibility for interfering in the work of her office."  Id.  The final section of the issue paper on "Next Steps" asks the Council to "Discuss the implications of what has occurred, the individuals involved, and recommend appropriate actions"; it also says that any HRC evaluations of Morris must be destroyed because they were affected "by the above-mentioned memos."  Id. at 9–10.  On cross-examination at trial, Plaintiff eventually conceded what is obvious from reading the paper: that the memos referred to throughout were those written by Tommelleo and Wilkes.  See Trial Tr. (10/31/17 AM) at 21:21–24:8.  In light of this evidence, the Court finds credible Higginbotham's testimony that she interpreted Morris's

issue paper as a response and thus reasonably viewed it as an act of insubordination.  See Trial

Tr. (11/1/17) at 25:1–26:17.  A seven-day suspension, the Court notes, was well within the range

of punishments EPA typically delivered for a first offense of insubordination.  Id. at 29:24–31:13.

Plaintiff lodged several attacks on this conclusion at trial, none of which alters the

Court's view that Higginbotham would have suspended her regardless of her race.  The first is

Morris's suggestion that the issue paper barely addressed the memos and did not specifically

respond to any of their allegations.  See Trial Tr. (10/30/17 PM) at 94:2–105:18.  The Court reads

it differently.  As discussed, the memos were mentioned throughout — indeed, they were

appended to it.  In characterizing the allegations as "false" and made "with the intent of harming

or attempting to destroy her credibility," Morris sufficiently engaged with the memos for

Higginbotham to have deemed her to have responded to them.  The second is Plaintiff's

argument that because the memos were not sent to Wilkes and Tommelleo, they could not be

considered a response.  The Court is again unpersuaded.  To qualify as a response, the document

need not have been sent directly to the original memo-writers; indeed, as it was sent to the

memo-writers' supervisors — who themselves had received copies of the memos critical of

Morris — it might best be seen as an escalated response.  See Joint Trial Exh. 6 at 1–2; Joint

Trial Exh. 5; see also Trial Tr. (10/30/17 PM) at 16–19.  In any event, in addressing the memos in

depth, the document undoubtedly responds to their allegations.

The last piece of evidence Morris cited on this issue at trial was Higginbotham's shifting

rationales for her behavior in the lead-up to the suspension.  After she received the memos,

Higginbotham did not give them to Morris for several months.  On direct examination,

Higginbotham said she withheld them to allow "the situation to kind of cool off."  Trial Tr.

(10/31/17 AM) at 133:14–15.  She had previously attested, though, that when Morris asked for

the memos, she told her that she could not find them because her desk was messy; she also justified the delay on the basis of sick leave she took during that period.  See Trial Tr. (10/31/17 PM) at 58:17–23, 61:3–8 (discussing previous testimony).  Higginbotham was impeached based on these inconsistencies, giving some support to Plaintiff's assertion that the suspension was fishy.  But the Court concludes that these inconsistencies do not undercut the rationale for the suspension.  That is because they address a somewhat different question from the legitimacy of the suspension, which depends on Higginbotham's actions after Morris received the memos.  The Court finds Higginbotham's testimony on the questions that matter — *viz.*, her directive to Morris and her understanding of Morris's issue paper — credible and persuasive.  So, even if Higginbotham may have given assorted reasons for initially withholding the memos, she was on solid ground in finding that Morris subsequently acted insubordinately in responding to them.  (The Court is unconvinced by Plaintiff's suggestion, see Trial Tr. (11/1/17) at 95:16–97:4, that the memos were withheld as part of a months-long scheme designed to induce Morris to respond in a manner that could justify disciplinary action.)  Before moving on, the Court notes that it finds Higginbotham's position on direct examination about withholding the memos a reasonable one — a supervisor could well decide to withhold a critical memo to allow a personnel dispute like this to cool down.

Just because EPA had a persuasive and well-grounded justification for the suspension does not mean that it would have been meted out in the absence of racial considerations.  To support her argument that the suspension was indeed motivated by discrimination rather than the charge of insubordination, Morris offered evidence of derogatory remarks Higginbotham had made about her and other white employees.  See Trial Tr. (10/30/17 PM) at 25:9–13 (Higginbotham referred to interns as "those little nasty white boys"); id. at 27:19–20

(Higginbotham said, "[T]hat will teach those white men a lesson."); Trial Tr. (10/31/17 AM) at 58:10–11, 60:3–4 (Higginbotham said that "that little white woman better stand in line" or she would "whip her into shape"). That testimony suggests that Higginbotham harbored discriminatory animus toward white employees like Morris and that this animus may have motivated the suspension. But in the absence of any nexus between that discrimination and the suspension and in light of the legitimate and persuasive justification EPA had for the suspension, the Court does not view that animus as having played a dispositive role in the suspension. It therefore finds that the Government would have suspended Morris regardless of her race.

Plaintiff's only response to Defendant's argument that it would have taken the same action regardless of Morris's race is to point to the jury verdict. See Reply Mot. Equitable Relief at 1–2. She says that, because "the jury found that 'Ms. Morris proved by a preponderance of the evidence that the EPA discriminated against her on the basis of race[,]' . . . Morris's suspension must be voided and she must be reimbursed for her lost pay plus interest." Id. That is not correct. The jury found only that race was "a factor motivating the adverse action," Ponce, 679 F.3d at 844 (citation omitted) — it did not necessarily conclude that Morris's race was the but-for cause of her suspension. Its verdict thus does not automatically entitle her to complete relief from the suspension. The Court of Appeals explained as much in Porter. There, the jury found that retaliation against the plaintiff for complaints of racial discrimination "was a motivating factor in his employer's decision not to select him for two [] positions." 414 F.3d at 15. That verdict did not, the Court clarified, "address whether [the defendant] would have taken the same action in the absence of retaliation," leaving "the district court free to decide the issue during the remedial stage in determining appropriate equitable relief." Id. at 21. The Court of Appeals thus affirmed the district court's decision that the defendant would have taken the same action

because it "was not inconsistent with the jury verdict." Id. Just as with the verdict in Porter, the jury's decision here left the issue open. Plaintiff's wholesale reliance on the jury verdict to support her argument for backpay and expungement of the suspension is thus unavailing.

This conclusion is consistent with the Court's prior Opinion denying the Government's motion for judgment as a matter of law. There, the Court concluded that a reasonable jury could find that the suspension was motivated, at least in part, by racial considerations. See Morris, 308 F. Supp. 3d at 160–64. To start, the Court's decisionmaking role in this Opinion is different. In the previous one, it had to decide what a reasonable jury could conclude; it did not find facts on its own. Id. at 159 ("Judgment as a matter of law is appropriate only if the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not have reached a verdict in plaintiff's favor.") (quoting Muldrow v. Re-Direct, Inc., 493 F.3d 160, 165 (D.C. Cir. 2007)). The question here, conversely, requires the Court to "make [its own] factual findings to determine appropriate 'make whole' relief under [Title VII]." Porter, 414 F.3d at 21. Of course, the Court's decision as to what a reasonable jury might conclude and its own determination of the facts can differ.

No inconsistency arises with the Court's prior Opinion for a separate reason: there is no logical disconnect between concluding that race was a motivating factor in the suspension and that the Government would have taken the same action regardless of racial considerations. Indeed, the existence of the limited affirmative defense at issue presupposes that the two can coexist. See Porter, 414 F.3d at 18. This case is a good example. As the jury found, racial animus motivated at least in part the decision to suspend Morris. Yet in light of the strength of the rationale for the suspension and the lack of evidence that discrimination was important to the suspension, the Government would have suspended her absent racial considerations.

In closing, the Court returns to the purpose underlying the exercise of equitable powers in Title VII cases: to make plaintiffs whole by placing them, as near as possible, "in the situation [they] would have occupied if the wrong had not been committed." Albemarle Paper, 422 U.S. at 418–19 (citation omitted). The Court's decision not to award backpay and expungement to Morris on account of her suspension lives up to this goal. The Court has found as a factual matter that Morris would have been suspended even if her employer had no discriminatory motivation. In other words, had the wrong not been committed, she would have been in the same situation. Awarding her backpay and expungement of that suspension is thus not necessary to make her whole.

B. Termination

Next is Plaintiff's request for complete relief for her subsequent termination from EPA — in the form of reinstatement and backpay. She maintains that because her discriminatory suspension caused her termination three years later, she deserves full relief on the termination. See Mot. Equitable Relief at 7–12. This would yield quite a recovery since she could receive somewhere in the ballpark of $1,000,000 less her federal retirement. (Morris does not ask for a specific amount, so the million-dollar estimate reflects the Court's back-of-the-envelope calculation based on seven years' employment at a salary of $154,438, assuming she continued to make $74 per hour for a 2,087-hour work year.) The Court finds such relief inappropriate for several reasons.

To start, Morris's argument for reinstatement and backpay as to her termination depends on her success in arguing for expungement of her previous suspension. In her words, "As a result of the utter voiding of the 2008 suspension, the later 2011 termination of plaintiff for a second claimed act of misconduct must be retroactively retracted if Morris is to truly be made

whole for the earlier discriminatory event." Mot. Equitable Relief at 8–9. The reason to void the termination here, in other words, is that it would not have occurred if the suspension were not on her record. The Court has already rejected Plaintiff's argument that the suspension should be expunged based on its finding that the Government would have suspended her regardless of her race. See supra at Section II.A. Any argument for relief from her termination, accordingly, fails.

While that would be quite enough to reject Plaintiff's request for relief on the termination, there is more: she waived and forfeited her right to pursue it. Start with waiver. At a pretrial conference, during a colloquy about the evidence that would be admitted at trial, EPA's attorney made the following remark: "[M]y understanding is that, before I became involved, there was a suggestion from [P]laintiff that they may try to recover damages associated with the termination by somehow linking the suspension to the termination; but it sounds like that may no longer be [P]laintiff's position." ECF No. 82 (Transcript of 7/25/17 Status Conference) at 5:11–15. Morris's attorney replied, "That was never [P]laintiff's position." Id. at 5:18. She clarified that Plaintiff originally planned to seek damages on the termination when the termination claim was still alive, but now that the suspension claim was the only one before the Court, Morris would "not . . . be seeking [as] a remedy — a reinstatement of termination." Id. at 6:2–3. Those statements make clear Morris's position before trial: that she would not be seeking equitable relief as to the termination. "When the parties make representations at a conference about which issues remain outstanding, they may fairly be held to those oral representations." Am. Cent. for Law & Justice v. U.S. Dep't of Justice, 325 F. Supp. 3d 162, 168 (D.D.C. 2018). Just so here. To allow Morris to reverse that position after the Government relied on her averments in preparing its case would be unfair and substantially prejudicial.

Plaintiff also forfeited her right to seek such relief when she did not include it in her pretrial statement. Local Civil Rule 16.5(b) requires the pretrial statement to include "an itemization of damages the party seeks to recover" and "a request for other relief sought by the party." D.C. Dist. Ct. Local Civ. R. 16.5(b)(1)(vii)–(viii); see also id. R. 16.5(b)(9) ("The request for other relief shall set forth all relief, other than judgment for a sum of money, the party claims to be entitled to receive against any other party."). "A party's failure to advance a theory of recovery in a pretrial statement issued following discovery conference constitutes [forfeiture] of that theory." Winmar, Inc. v. Al Jazeera Int'l, 741 F. Supp. 2d 165, 185 (D.D.C. 2010) (quoting Gregory v. Shelby Cty., 220 F.3d 433, 442–43 (6th Cir. 2000)); see also McCarthy v. Lerner Stores Corp., 9 F.R.D. 31 (D.D.C. 1949). It is undisputed that Plaintiff did not include any request for equitable relief from her termination in the pretrial statement. See ECF No. 60 (Pretrial Statement) at 11. She therefore both waived and forfeited her right to obtain such relief.

Morris's silence in response to this argument is deafening. See ECF No. 100 (Reply Mot. Equitable Relief) (any response entirely absent). Understandably so, for waiver and forfeiture are particularly appropriate under these circumstances. For one, her prior position is especially clear, both from her counsel's express statements at the status conference and from the contents of her pretrial statement. For another, holding Plaintiff to her word serves the purposes underlying the waiver and forfeiture doctrines. "The purpose of the pretrial statement is to narrow the issues and to put both the Court and the parties on notice of which issues of fact and law are in dispute. The Court, as well as the parties, are entitled to rely on the representations made in the pretrial statement in order to be fully prepared for trial." Winmar, 741 F. Supp. 2d at 185. In the event the Court were to rule on Morris's termination argument now, Defendant would be severely prejudiced by her pretrial conduct; to prepare its defense, the Government

needs (and is entitled to) knowledge of the damages Plaintiff will seek. See Armenian Assembly of Am., Inc. v. Cafesjian, 746 F. Supp. 2d 55, 72 (D.D.C. 2010) (discussing central role pretrial disclosures play in giving notice to other side of issues to be proved at trial). For example, had the Government known about Plaintiff's intention to seek these damages, it could have asked to introduce evidence (to the Court, if not to the jury) about whether EPA would have terminated Morris even if she had not previously been suspended. Instead, the termination was never addressed at trial. In such a circumstance, to now require the Government to pay would render waiver a meaningless concept.

C. Attorney Fees

Plaintiff, not surprisingly, also seeks attorney fees and costs associated with this litigation. Title VII allows the prevailing party to receive from the loser "a reasonable attorney's fee in addition to other relief." Copeland v. Marshall, 641 F.2d 880, 889 (D.C. Cir. 1980) (*en banc*); see 42 U.S.C. § 2000e-5(k). "The primary purpose of awarding fees in Title VII cases," Copeland, 641 F.2d at 890, is "to encourage individuals injured by . . . discrimination to seek judicial relief." Id. (quoting Newman v. Piggie Park Enters., Inc., 390 U.S. 400, 402 (1968)). In determining whether to award fees and what amount is appropriate under the statute, the Court must make two inquiries. First it determines whether the party seeking fees is "the prevailing party" and is thus eligible to receive fees. See Hensley v. Eckerhart, 461 U.S. 424, 433 & n.7 (1983). If so, the next question is whether the fee sought is reasonable. A "reasonable" fee is one that is "sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case," Perdue v. Kenny A., 559 U.S. 542, 552 (2010), "but that does not produce windfalls to attorneys." Blum v. Stenson, 465 U.S. 886, 897 (1984) (formatting modified).

There is no question here that Plaintiff prevailed — at least in part — in her suit: She received a verdict in her favor and damages in the amount of $25,000. Morris's eligibility for fees, moreover, is unaffected by the Court's conclusion, see supra Section II.A, that she would have been suspended regardless of her race. See 42 U.S.C. § 2000e-5(g)(2)(B)(ii) (providing that plaintiffs are entitled to attorney fees even if race were no more than a motivating factor in adverse employment action). The only question, accordingly, is whether the fee Plaintiff requests is reasonable. On that issue, the D.C. Circuit has set forth a "three-part analysis." See Eley v. District of Columbia, 793 F.3d 97, 100 (D.C. Cir. 2015) (evaluating fees under the Individuals with Disabilities Education Act); Salazar v. District of Columbia, 809 F.3d 58, 61 (D.C. Cir. 2015) (applying framework to § 1983 fee request). The first step is to "determine the 'number of hours reasonably expended in litigation.'" Salazar, 809 F.3d at 61 (quoting Eley, 793 F.3d at 100). As part of that inquiry, the Court considers whether to adjust the award based on "the degree of success obtained." See Hensley, 461 U.S. at 436. Next, the Court sets "the reasonable hourly rate." Salazar, 809 F.3d at 61 (quoting Eley, 793 F.3d at 100). The Court last applies "multipliers as 'warranted.'" Id.; see also George Hyman Const. Co. v. Brooks, 963 F.2d 1532, 1535–36 (D.C. Cir. 1992).

Plaintiff asks for $481,207.61 in fees, see Reply Mot. Equitable Relief at 1, which request the Government challenges on two grounds, both falling under the first step of the D.C. Circuit's framework. There is no dispute, in other words, over the hourly rate or the applicability of any multiplier. Defendant first objects that the number of hours expended is unreasonable because Plaintiff attained only limited success in the litigation. See Opp. Mot. Equitable Relief at 20–26. It next asserts that many of the hours for which Morris seeks compensation are excessive or unnecessary. Id. at 26–39. The Court addresses each in turn, bearing in mind that the burden lies

with the fee-seeking party to "document[] the appropriate hours[] and justify[] the reasonableness of the rates." Salazar, 809 F.3d at 61 (quoting Covington v. District of Columbia, 57 F.3d 1101, 1107–08 (D.C. Cir. 1995)).

1. *Success*

"[T]he extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorney's fees." Hensley, 461 U.S. at 440. Courts account for success using a "two-step inquiry focused on the following questions: First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which [s]he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?" George Hyman, 963 F.2d at 1535 (quoting Hensley, 461 U.S. at 434). As to the first, with one exception discussed below, neither Morris nor the Government suggests that the claims Plaintiff lost are "unrelated to the claim[] on which [s]he succeeded." Id. And for good reason. While the termination and retaliation claims differ in certain respects from the suspension claim, they are not "distinctly different in all respects, both legal and factual," from that claim. See Williams v. First Gov't Mortg. & Invests. Corp., 225 F.3d 738, 746 (D.C. Cir. 2000) (quoting Morgan v. District of Columbia, 824 F.2d 1049, 1066 (D.C. Cir. 1987)). With the exception noted below, it would thus be impossible for the Court to "divide the hours expended on a claim-by-claim basis." Craig v. District of Columbia, 197 F. Supp. 3d 268, 283 (D.D.C. 2016). The key inquiry is therefore Hensley's second one: whether and how much to reduce the fees based on "the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." 461 U.S. at 435.

Even as to this second inquiry, the parties have found some common ground. They both agree, for instance, that the award should be reduced on account of Morris's incomplete success.

See Opp. Mot. Equitable Relief at 20–21; Reply Mot. Equitable Relief at 9–11. What they do not agree on is how the reduction should be applied and how much of a reduction is appropriate. The Government asks for an across-the-board percentage cut. See Opp. Mot. Equitable Relief at 25–26. Morris, by contrast, asks the Court to consider her success as to different periods of the litigation separately. See Reply Mot. Equitable Relief at 10. The Court agrees with Plaintiff's approach, which it notes has been employed by other district courts in this Circuit. See, e.g., Radtke v. Caschetta, 254 F. Supp. 3d 163, 171 (D.D.C. 2017); Craig, 197 F. Supp. 3d at 284 & n.7. It allows the Court to differentiate between hours spent entirely on successful claims and hours spent in part on successful and in part on unsuccessful claims, adjusting the percentage reductions accordingly. In that way, the Court can arrive at a fee that fairly reflects "the degree of success obtained." Hensley, 461 U.S. at 436. With those principles established, the Court turns to assessing Plaintiff's success at each stage of this litigation and what, if any, corresponding adjustments are appropriate.

### a. Filing of the First Complaint

The Court starts where the case started: at the filing of the initial Complaint. Morris asks for $5,504.50 in fees for Bernabei & Kabat, PLLC for its work preparing the Complaint. See Mot. Equitable Relief at 20. The problem is that this pleading did not contain the suspension claim on which Plaintiff ultimately succeeded; the entirety is devoted to claims based on her termination. See Compl. This is the exception the Court noted above to the parties' agreement that the deficient claims were related to the one on which she prevailed. While the suspension and termination claims share some factual and legal bases, such that work on one cannot as a general matter be distinguished from work on the other, it is clear in this circumstance that Bernabei & Kabat did not do any work on the suspension claim. No such claim appears in the

Complaint — Morris's subsequent attorneys amended the Complaint later to add the suspension claim. See Am. Compl., ¶¶ 1, 11. Nor has Plaintiff offered evidence that those hours were spent on other work supporting the successful claim. (Indeed, her Reply is silent as to the Government's argument that fees for work done on the first Complaint are inappropriate.) Under such circumstances, fees should not be awarded. See George Hyman, 963 F.2d at 1535 ("[A] plaintiff should not be able to force his opponent to pay for the legal services involved in bringing groundless claims simply because those unsuccessful claims were brought in a lawsuit that included successful claims.") (quoting Sierra Club v. EPA, 769 F.2d 796, 801 (D.C. Cir. 1985)). The Court therefore rejects this relatively minor portion of Plaintiff's fee request.

> b. Post-First Complaint to Motion to Dismiss and Appeal

Next up is Morris's request for $155,196.70 in fees for her attorneys' work from the time they started on her case (just after the first Complaint was filed) to the district court's order dismissing certain claims (approximately May 8, 2011, to Feb. 6, 2012) and during her appeal (approximately Mar. 25, 2014, to Aug. 9, 2016). Morris sought the same relief — on roughly thirteen claims — during both periods, making it appropriate for the Court to consider her degree of success there together. Among those claims were four based on her termination, four on her suspension, four on her reassignment of duties, and one on hostile work environment. See Am. Compl., ¶¶ 9–22. She ultimately prevailed on only one of those claims: that her seven-day suspension was racially discriminatory. Based on her limited success relative to the numerous claims she litigated during this period, the Court finds that a reduction of 80% is appropriate. Three specific considerations drive this substantial reduction.

First off, Plaintiff lost on the primary claims she litigated during this period — those centered on her termination. A brief glance at her filings confirms that Morris at that time

principally sought relief for that adverse action. The first Complaint, for example, focused only on her firing, containing claims that it was retaliatory and motivated by race, age, and gender discrimination. See Compl., ¶¶ 61–97. The Amended Complaint, while including the suspension claim on which Morris ultimately prevailed, also focused on the termination, along with separate (subsequently unsuccessful) claims of retaliation and hostile work environment. Compare Am. Compl., ¶¶ 11, 23(c) (noting suspension), with id., ¶¶ 6–10, 12–23 (focusing on other alleged adverse employment actions). Next, Plaintiff's Opposition to the Motion to Dismiss spent about eleven (out of thirteen) pages on the claims that were dismissed. See ECF No. 9 (Opp. to MTD); see also Morris, 842 F. Supp. 2d 171. While more time during the appeal was spent on the suspension claim, the proceedings still spilled substantial ink on Morris's unsuccessful claims and, in particular, her termination ones. See Morris, 825 F.3d at 666–67, 673–74. Because a substantial amount of the attorneys' time during this period was devoted to Morris's unsuccessful termination claims, it makes sense to reduce the fees award accordingly.

The termination claims that Morris lost during this period were important in another sense: they were the financial centerpiece of her lawsuit against EPA. Put another way, not only did those claims take top billing in the Complaint and briefing, but they also gave Morris the best chance for substantial relief. Had she won on those claims, Plaintiff would likely have been entitled to reinstatement, backpay, and compensatory damages for the period since she had been terminated. The suspension claims were peanuts next to the prospect of such relief. Comparing Morris's goal when the Complaint was filed — a million dollars in damages and backpay plus reinstatement — to what she achieved in the end — twenty five thousand in damages — thus clarifies her "degree of success," which the Court can only describe as minimal. Morris's lack of

success litigating the core of her case during this period factors substantially into the Court's decision to reduce the fees by such a high percentage.

Second, Plaintiff prevailed on only one out of the thirteen claims on which she sought relief.  The other claims focused either on different adverse employment actions, including reassignment of duties and hostile work environment, or different discriminatory motives, including age and gender.  Morris lost on all of these claims at the motion-to-dismiss and appeal stages.  Morris, 842 F. Supp. 2d 171.  Even many weak-hitting pitchers post a batting average greater than one out of thirteen.  This lack of success further justifies a substantial reduction in the proper attorney fees for this period.

Third and last, the Court emphasizes that the attorneys' efforts on Morris's suspension claim were somewhat distinct from their efforts on her other unsuccessful claims.  The arguments for dismissal of the suspension claim focused on the particularities of how Morris exhausted that claim; the arguments as to the termination and hostile-work-environment claims, by contrast, centered on separate exhaustion and Rule 12(b)(6) arguments.  The core injury at the heart of several of those unsuccessful claims is also distinct from that of the prevailing one.  The upshot is that the attorneys' time spent on the numerous fruitless claims did not simultaneously support Morris's successful claim, making such time less deserving of full compensation.  This is not to say that these hours must be excluded entirely under the first step of Hensley; on the contrary, they are still related to Plaintiff's ultimate suspension claim, as the Government concedes.  The Court's point is merely that, in reducing the award based on success under Hensley's step two, it makes sense to consider to what degree the work on the unsuccessful claims supported victory on the successful one.

The Court finds that these three considerations, taken together, support reducing the fees for this period by 80%. Though substantial, such a reduction is in line with the practice of other district courts in this circuit faced with comparable levels of success. In Baylor v. Mitchell Rubenstein & Assocs, 735 F. App'x 733 (D.C. Cir. 2018), for example, the Court of Appeals affirmed the district court's reduction of a fee award by 60% based on the plaintiff's ultimate success on one out of three claims. Id. at 736. And in Radtke, the Court reduced the fee award for pre-appellate work by 40% in light of the plaintiff's success on three out of nine claims, though the successful claims shared much of the same factual matter as the unsuccessful ones. See 254 F. Supp. 3d at 177. Last, in McAllister v. District of Columbia, 21 F. Supp. 3d 94 (D.D.C. 2014), the Court reduced the fee award by 50% to reflect that the plaintiff there had achieved about 33% of the relief requested. Id. at 103–04; see also A.B. v. District of Columbia, 19 F. Supp. 3d 201, 210 (D.D.C. 2014) (overruling objection to 60% reduction in fee because plaintiff did not prevail on three of four related claims); Mazloum v. District of Columbia, 654 F. Supp. 2d 1, 4 (D.D.C. 2009) (ordering reduction of 60% because plaintiff succeeded in part on one claim and not at all on a second). The reduction in this case is somewhat greater than in those cases, but the success is concomitantly less. The large reduction, furthermore, only applies to one portion of the proceedings, rather than the entire litigation. On that note, the Court turns to the question of any reduction for the remainder of the proceedings.

c. Discovery to Summary Judgment and Remand to the Present

The final period of the litigation is from discovery to summary judgment and then from remand until the present. It makes sense to consider those parts of the litigation together, as Plaintiff suggests, because the litigation focused there only on the suspension claim — the one on which she ultimately succeeded. Morris requests $371,636.20 for this period and asks for no

reduction on account of success. See Reply Mot. Equitable Relief at 10 (adding the totals from what Plaintiff refers to as periods 2 and 4). As the Government seeks an across-the-board percentage cut of the fees, it presumably thinks some reduction is appropriate for this period of the litigation also. See Opp. Mot. Equitable Relief at 22–23. The Court concludes that a relatively modest reduction of 20% is appropriate.

While Plaintiff received a jury verdict in her favor on this claim, she will ultimately receive only a small award of $25,000 in noneconomic damages. At various points, Morris has requested much more relief, even on her suspension claim alone. In her pretrial statement, she asked for $300,000 in compensation for non-economic damages. See Pretrial Statement at 11. Morris's success in this case is assuredly about more than money: she received vindication from a jury of her peers that her treatment was unlawful. But in determining whether the requested fees are "reasonable in relation to the success achieved," Williams, 225 F.3d at 746, the Court must also consider Morris's monetary success relative to what she sought.

During this period, Morris's attorneys spent 704 hours working towards a verdict that yielded only limited financial benefits. Courts have not hesitated under such circumstances to reduce the award, even where the plaintiff technically prevailed on the claim she was litigating. See, e.g., AS v. District of Columbia, 842 F. Supp. 2d 40, 47 (D.D.C. 2012) (reducing award by 50% because plaintiffs succeeded in obtaining school-tuition payments for one half of the year, where they had requested tuition payments for the entire year); Roseboro v. Billington, 618 F. Supp. 2d 85, 88–89 (D.D.C. 2009) (reducing award by one third where plaintiff prevailed on her claim but received only limited equitable relief); Smith. v. District of Columbia, 466 F. Supp. 2d 151, 160–61 (D.D.C. 2006) (reducing award by 25% where plaintiff "achieved only a very modest success on the amount of compensation awarded"); see generally Goos v. Nat'l Assoc. of

Realtors, 68 F.3d 1380, 1387 (D.C. Cir. 1995) ("[I]f the district court determines and explains why the total hours expended were not reasonable in relation to the results obtained—regardless of the number of claims raised—the court has discretion to reduce fees."). In all, balancing her limited monetary success against a successful jury verdict on the claim she litigated for this entire period, and accounting for the substantial number of hours her attorneys expended on that claim, the Court concludes that a 20% reduction is appropriate.

### 2. *Excessive or Unnecessary Time*

With adjustment for success out of the way, the Court turns to the Government's second objection to the requested fees: that they seek recompense for excessive or unnecessary time. See Opp. Mot. Equitable Relief at 26–39. It is well established that courts should not award fees for "excessive, redundant, or otherwise unnecessary [hours]." Hensley, 461 U.S. at 434. At the same time, "[a] request for attorney's fees should not result in a second major litigation." Id. at 437. It is, consequently, "not the business of the Court to 'comb through endless lists of billing entries to gather data' the petitioner has 'not seen fit to make clear,' or to separate noncompensable time from compensable time." Cobell v. Jewell, 234 F. Supp. 3d 126, 175 (D.D.C. 2017) (quoting Am. Immigration Council v. U.S. Dep't of Homeland Sec., 82 F. Supp. 3d 396, 414 (D.D.C. 2015)). In this regard, Defendant asks for an across-the-board reduction in fees to account for the attorneys' vague entries and for their request for excessive and non-compensable time. Id. Addressing each in turn, the Court finds that a light trim of 5% is appropriate.

EPA first takes issue with what it says are Morris's vague time entries. For example, it maintains that certain descriptions of events as "[t]rial prep" or "[d]iscuss trial strategy" are inadequate. See Opp. Mot. Equitable Relief at 28. It also criticizes as generic time entries like

"Draft/edit argument in opp. Summary judgment" and accuses Morris's attorneys of block billing. Id. at 30. The Court agrees that such entries should be more specific and that block billing should be avoided. Nevertheless, drawing on its observations at trial, the Court has enough information to determine whether such entries were for time reasonably expended. As discussed next, it finds that they largely were. In a similar vein, the Government criticizes the request for 24.2 hours by attorney Ellen Renaud, who did not have a speaking role at trial. Id. at 28. Of course, an attorney who does not appear before the jury may nevertheless assist during trial. EPA's apparent suggestion otherwise is mysterious.

Defendant next argues that Morris's attorneys request compensation for excessive and non-compensable time. Id. at 31–38. As to the former, it cites 101.9 hours on the opposition to summary judgment, 66.3 hours opposing the motion to dismiss, 73.2 hours spent opposing Defendant's renewed motion for judgment as a matter of law, 85.7 hours spent on this Motion for Equitable Relief and Fees, and 4.1 hours on a two-page motion for an extension of time. Id. at 32–34. The 101.9 hours on the opposition to the summary judgment motion seems somewhat excessive — that opposition addressed only Plaintiff's suspension claim and contained about eleven pages of analysis. See Opp. MSJ. The 4.1 hours on the extension motion may also be a bit high. But the others seem largely in line, in the Court's judgment, with the number of hours a devoted litigation team might spend on dispositive or potentially dispositive motions. For these reasons, the Court finds that a reduction of only 5% is appropriate for excessive billing.

The Government throws out a number of other problems with the fee request. As to some of those issues, Plaintiff has withdrawn or reduced the request. Having considered them closely, the Court is unpersuaded as to the others. One example: Contrary to Defendant's arguments that the time organizing exhibits and compiling a joint appendix should be billed at a paralegal rate,

the Court finds it reasonable for experienced counsel preparing for a trial or appeal to undertake those tasks.  No additional reduction is therefore appropriate.

      3.  *Other Issues*

      A few ancillary issues need to be covered.  First, Defendant maintains that attorneys Peter Broida and Debra Roth should not receive anything because they have not submitted sworn statements to justify their fees.  <u>See</u> Opp. Mot. Equitable Relief at 40–41.  Plaintiff does not respond in her Reply.  The Court agrees that, in the absence of further information and sworn statements, fees to those attorneys are not appropriate.

      Second, the Court notes that Plaintiff has withdrawn its request for the $10,138.60 for services performed by Robert Seldon and Jennifer Amore back in 2008 in connection with Morris's suspension.  <u>See</u> Mot. Equitable Relief at 16–17 & Exh. 7.  In its Reply, Plaintiff notes that it has lowered its request for fees to "$481,207.61 ($475,100.60 of which is for the work of Swick & Shapiro, P.C.)."  Reply Mot. Equitable Relief at 1.  The difference between the amount requested for Swick & Shapiro and the total amount now requested equals the amount Plaintiff seeks for Bernabei & Katz ($5504.50) plus the amount she seeks for Debra Roth and Peter Broida ($602.50).  As it appears that she no longer requests fees for any other attorneys, the Court assumes she has withdrawn her request for an award of fees to Seldon and Amore.

      Third, the Government takes issue with the upwards of $10,791.29 in <u>costs</u> claimed by Plaintiff.  <u>See</u> Reply Mot. Equitable Relief at 1.  It specifically argues that the Court should reduce copying and printing costs and reject as unsubstantiated witness fees and certain miscellaneous expenses.  <u>See</u> Opp. Mot. Equitable Relief at 42–43.  At the same time, the Government accepts a variety of claimed costs without specific documentation, including filing fees, process expenses, delivery expenses, and travel costs.  <u>Id.</u>  The Court sees no reason that the

witness fees and miscellaneous expenses should be treated differently.  Witness fees are mandated by the federal rules, so their inclusion should be expected.  And the Court will not require Plaintiff's attorneys to offer more specific receipts for the miscellaneous expenses, given that Shapiro has submitted a declaration supporting how those small dollar amounts were spent. Finally, as to copying and faxing, Plaintiff has agreed to reimbursement at a lower rate.  A brief note as to the costs calculation: Although Plaintiff's Reply seeks $10,791.29 in costs (at 1), it also agrees to reduce copying and fax expenses by $2220.50.  Compare Reply Mot. Equitable Relief at 25 (asking for $2533.20 for copying and $136.20 for faxes), with Mot. Equitable Relief, Exh. 5, at 27 (asking for $4449.90 for copying and $440.00 for faxes).  By the Court's calculations, a reduction of $2220.50 from the original costs requested — $12,571.79 (Mot. for Equitable Relief at 21) — yields a total of $10,351.29.  The chart below shows the relevant calculations.

Fourth, while Courts often separately analyze fees incurred while drafting a motion for fees, colloquially known as "fees on fees," see, e.g., McAllister v. District of Columbia, 160 F. Supp. 3d 273, 279–80 (D.D.C. 2016), the Government — apart from its assertion that the time spent was unreasonable, discussed above — does not separately address that issue.  The Court, accordingly, treats it as part of the third period of this litigation discussed above.  Like the award for that period, fees on fees are reduced by 5% for excessive billing and 20% for lack of success.

\*      \*      \*

Only the math remains.  Recall the three steps in determining an appropriate fees award: (1) Set the number of hours reasonably expended; (2) Multiply by the reasonable hourly rate; and (3) Apply multipliers as warranted.  The Court has explained that it will reduce the number of hours across the board by 5%.  It has also explained that it will eliminate entirely the award for

the pre-first Complaint period, reduce the award for the pre-motion to dismiss and appeal periods

by 80%, and reduce the award for the remaining periods by 20%. As to the various reductions, it

does not matter mathematically whether they are applied to the hours expended or to the award

in its entirety; for ease of calculation, the Court takes the latter approach. The Court will,

accordingly, implement these adjustments by period of the litigation, starting with the 5%

reduction and then the reductions for lack of success. Plaintiff, per the chart below, will end up

with $322,282.17.

**Chart of Attorney Fees and Costs Awarded**

| Litigation Period | Attorney/Firm | Amount Requested | Adjustment | Amount Awarded |
|---|---|---|---|---|
| Opposing Suspension in 2008 | Robert Seldon and Jennifer Amore, then of Robert C. Seldon & Associates, P.C. | $10,138.60 | Withdrawn, as discussed above | $0.00 |
| March 2008 and August 2012 Consultations re EEO claims | Debra Roth and Peter Broida, then of Shaw Bransford Veilleux & Roth, P.C. | $602.50 | Reduce by 100% | $0.00 |
| Filing of the First Complaint | Lynne Bernabei and Alan Kabat, then of Bernabei & Kabat, PLLC | $5,504.50 | Reduce by 100% | $0.00 |
| Post-First Complaint to Motion to Dismiss; Appeal | Swick & Shapiro, P.C. | $155,196.70 | Reduce by 5% for excessive hours, then reduce by 80% for lack of success | $29,487.37 |
| Post-Motion to Dismiss to Summary Judgment; Remand to Present | Swick & Shapiro, P.C. | $371,636.20 | Reduce by 5% for excessive hours, then reduce by 20% for lack of success | $282,443.51 |
| Costs | Swick & Shapiro, P.C. | $11,428.07 | Reduce copy and fax costs by $2220.50 per | $9,207.57 |

| | | | Plaintiff's Reply (at 25) | |
|---|---|---|---|---|
| Costs | Susan Morris | $1,143.72 | None | $1,143.72 |
| **TOTAL** | | | | **$322,282.17** |

### III.     Conclusion

For these reasons, the Court will grant in part and deny in part Plaintiff's Motion for

Equitable Relief.  A separate Order requiring Defendant to pay $322,282.17 in fees and costs will

issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  December 3, 2018